Anthony Paduano (AP 8400)
Katherine B. Harrison (KH 9745)
Kathryn L. Bedke (KB 7855)
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100
Attorneys for the Defendant
Xethanol Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GLOBAL ENERGY AND MANAGEMENT, LLC,               :

                                  Plaintiff,               :

          -against-                                        :        No. 07-CV-11049 (NRB)

XETHANOL CORPORATION,  CHRISTOPHER          :
D'ARNAUD-TAYLOR, JEFFERY LANGBERG,
LAWRENCE S. BELLONE, LOUIS B. BERNSTEIN,    :
DAVID AMES, and ROBIN BULLER,
                                                           :

                                  Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK )


**AFFIDAVIT OF KATHERINE B. HARRISON IN
SUPPORT OF DEFENDANT XETHANOL CORPORATION'S
MOTION FOR SANCTIONS PURSUANT TO RULE 11**

KATHERINE B. HARRISON, under penalty of perjury, declares:

1.      I am admitted to practice law before the courts of the State of New

York, and am a member of the bar of this Court.  I am a member of the firm of Paduano

& Weintraub LLP, 1251 Avenue of the Americas, Ninth Floor, New York, New York,

10020, counsel for Defendant Xethanol Corporation ("Xethanol") in the captioned matter.  As far as I am aware, no other defendant in this action has been served with a complaint.  I respectfully submit this Affidavit in support of Xethanol's Motion for Sanctions Pursuant to Rule 11.  I make this Affidavit based on my personal knowledge and review of documents relevant to the instant motion.

2.    A true and correct copy of the Original Complaint is attached as Exhibit A.

3.    A true and correct copy of a letter, dated November 27, 2007, from Xethanol's counsel to counsel for Plaintiff Global Energy and Management, LLC ("Global") is attached as Exhibit B.

4.    A true and correct copy of a letter, dated November 29, 2007, from Global's counsel to Xethanol's counsel is attached as Exhibit C.

5.    A true and correct copy of the First Amended Complaint is attached as Exhibit D.

6.    A true and correct copy of the Amended Complaint, which Global's counsel filed with the Court on January 7, 2008, and which was actually the second amended complaint, is attached as Exhibit E.

7.    A true and correct copy of a letter, dated January 16, 2008, from Xethanol's counsel to Global's counsel is attached as Exhibit F.

8.    A true and correct copy of Global's Motion for Leave to File a Second Amended Complaint and Certification of Robert A. Vort in Support of Plaintiff's Motion for Leave to File Second Amended Complaint is attached as Exhibit G.

9.    A true and correct copy of the Order, dated March 19, 2008, granting Global's motion to file the Second Amended Complaint is attached as <u>Exhibit H</u>.

10.    A true and correct copy of the Second Amended Complaint is attached as <u>Exhibit I</u>.  The Second Amended Complaint is the first pleading that Global served on Xethanol, on or about March 20, 2008.

11.    A true and correct copy of a letter, dated March 27, 2008, from Xethanol's counsel to Global's counsel is attached as <u>Exhibit J</u>.

12.    A true and correct copy of a letter, dated April 21, 2008, from Xethanol's counsel to the Court is attached as <u>Exhibit K</u>.

13.    A true and correct copy of a letter, dated April 22, 2008, from Global's counsel to the Court is attached as <u>Exhibit L</u>.

14.    A true and correct copy of a letter, dated May 1, 2008, from the Court to the parties' counsel is attached as <u>Exhibit M</u>.

15.    A true and correct copy of the Third Amended Complaint is attached as <u>Exhibit N</u>.

16.    A true and correct copy of a letter, dated May 23, 2008, from Xethanol's counsel to Global's counsel is attached as <u>Exhibit O</u>.

17.    A true and correct copy of the Docket Sheet for the instant action, Civ. No. 07-CV-11049 (NRB), is attached as <u>Exhibit P</u>.

18.    A true and correct copy of Xethanol Corporation's Form 8-K, dated June 23, 2006, which was filed with the Securities and Exchange Commission, and its

Exhibit 1.1, the Organizational Agreement between Xethanol Corporation and Global Energy and Management, LLC, is attached as <u>Exhibit Q</u>.

Katherin B. Harr

Katherine B. Harrison

Sworn to before me this
17th day of June, 2008

_____
Notary Public

GIDEON E. MARK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02MA6063514
Qualified in New York County
Commission Expires Sept. 4, 2009

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com- :
pany of Connecticut, :
                                    :
                    Plaintiff,      :
                                    :
          -vs-                      :
                                    :
XETHANOL CORPORATION, CHRISTO- :
PHER D'ARNAUD-TAYLOR, JEFFERY :
LANGBERG, LAWRENCE S. BELLONE, :
LOUIS B. BERNSTEIN, DAVID AMES, :
THOMAS J. ENDRES, ROBIN BUL- :
LER, DAVID KREITZER and JOHN :
MURPHY, :
                                    :
                    Defendants. :
---------------------------------- x



**07 CV 11049**

COMPLAINT and DEMAND
FOR JURY TRIAL

Global Energy and Management, LLC, a limited liability com-

pany of Connecticut ("plaintiff" or "Global Energy"), with its

principal place of business at 130 Captains Drive, Westbrook,

Connecticut, complains as follows:

## JURISDICTIONAL STATEMENT

1.    Global Energy is a limited liability company of Connec-

ticut whose principal place of business is located in Connecti-

cut.

2.    All members of Global Energy are citizens of Connecti-

cut.

3.    Xethanol Corporation is a Delaware corporation whose

principal place of business is in New York.

4.    Upon information and belief, none of the individual de-

fendants is a Connecticut citizen.

5.    The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7.    Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8.    Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9.    Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times rele- vant to this action.

10.    Defendants represented to Lee Tyrol, the manager of Global Energy, and other representatives of Global Energy that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner.    Defendants misrepresented the state of Xenathol's business operations and the state of the technology it possessed.    They stated that Xethanol owned patents

and other technology from which it could manufacture ethanol from bio-mass in a profitable manner. They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

11. The individual defendants made these representations to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings. Defendants also made the following representations in written documents including, but not limited to, the following:

a. In a brochure published in January 2005 entitled "Xethanol: Biomass to Biofuels" that Xethanol was producing 6,000,000 gallons of ethanol a year.

b. A press release dated September 16, 2005 in which Xethanol stated: "Xethanol Corporation seeks to become a leader in the emerging biomass-to-ethanol industry. Its mission is to convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, such as xylitol. Xethanol's strategy is to deploy proprietary bio-technologies that will extract and ferment the sugars trapped in these biomass waste concentrations. Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based processors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production facilities, where it is deploying these technologies."

3

b.   In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol. Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candies, toothpastes and diabetic regimens. Xylitol is a co-product derived from biomass-to-ethanol production. At the present time, we own two ethanol plants in Iowa - Xethanol BioFuels in Blairstwon and Permeate Refining in Hopkinton. We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol."

c.   In a press release dated August 26, 2005, Xethanol reported that it had acquired the stock of Xylose Technologies, Inc.. The release quoted Christopher d'Arnaud Taylor as saying: "This is far more than a purchase of a milestone technology for lowering the cost of making ethanol from biomass. Rather, it is the pooling of Xethanol management with a world class scientific team headed by Dr. Jeffries that will continue to develop ways to make xylitol and ethanol more efficiently from biomass. This alliance with Dr. Jeffries and his team at the USDA Forest Products Lab will enable Xethanol to accelerate development and deployment

4

$250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to bio-fuels business.

15.  As a result of the foregoing, plaintiffs were damaged in an amount exceeding $10,000,000.

Wherefore, Global demands judgment a) compelling defendants to pay $10,000,000 to Global, b) consequential damages, c) pre-judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues triable by jury.

Dated: November 23, 2007

ROBERT A. VORT, LLC

Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
201-342-9504 fax
rvort@vortlaw.com

6

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

November 27, 2007

<u>Via Fax and Federal Express</u>

Robert A. Vort, LLC
2 University Plaza, Suite 200
Hackensack, New Jersey 07601

Re: Global Energy and Management, LLC v. Xethanol Corporation, Christopher
D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein
<u>David Ames, Thomas J. Enders, Robin Buller, David Kreitzer and John Murphy</u>

Dear Mr. Vort:

We represent Xethanol Corporation ("Xethanol") and certain of its current and former officers and directors. We write pursuant to Rule 11 of the Federal Rules of Civil Procedure to demand that Plaintiff and you withdraw the complaint you filed in the Southern District of New York on Friday November 23, 2007, a copy of which you had delivered to me. We do not believe that your complaint states a cause of action under New York law. In addition, we believe that all of the events alleged in the complaint occurred before David Ames, Louis Bernstein or Thomas Endres were affiliated with Xethanol and during a period in which Jeffrey Langberg was not a director or officer of Xethanol. (We note that Xethanol has never employed a person named Thomas Enders; we assume you meant Endres.) Neither David Kreitzer nor John Murphy was ever a director or officer of Xethanol. Therefore, we do not believe there is any factual basis for naming those individuals in the complaint.

Accordingly, please withdraw the complaint you have filed immediately and send us notice of such withdrawal. We will follow this letter by serving you with our motion for sanctions pursuant to Rule 11(c)(1)(A). However to mitigate Defendants' expenses, we ask that you act voluntarily now.

PADUANO & WEINTRAUB LLP

Please let us know your intentions no later than November 30, 2007.

Very truly yours,

*Katherine B. Harrison (KR)*

Katherine B. Harrison

# ROBERT A. VORT, LLC

www.vortlaw.com

**Robert A. Vort**
Certified Civil Trial Attorney

**Karin R. White Morgen**

2 University Plaza, Suite 200
Hackensack, New Jersey 07601
Telephone: 201-342-9501
Facsimile: 201-342-9504

November 29, 2007

Katherine B. Harrison, Esq.
Paduano & Weintraub, LLP
Ninth Floor
1251 Avenue of the Americas
New York, New York 10020

Re: Global Energy v. Xethanol

Dear Ms. Harrison:

The clerk returned the first complaint because I had not signed the civil cover sheet. Then we spoke, and I received your letter. I have amended the new original (and enclosed) complaint to plead identities and corporate positions upon information and blief. Although people changed with the course of time, the misrepresentations continued. If, in the course of pretrial discovery, evidence shows that plaintiff's belief is incorrect, we will dismiss as to any individual or individuals who played no part. Until then, we are maintaining our initial position.

Very Truly Yours,

Robert A. Vort

RAV:ey
enclosure
by Federal Express
cc:  Global Energy & Management, LLC
     07-160

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,                     :

     Plaintiff,  :    07 Civ.

   -vs-     :

            COMPLAINT and DEMAND
XETHANOL CORPORATION, CHRISTO-:  FOR JURY TRIAL
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL- :
LER, DAVID KREITZER and JOHN
MURPHY,                                  :

     Defendants. :
————————————————————x

   Global Energy and Management, LLC, a limited liability com-
pany of Connecticut ("plaintiff" or "Global Energy"), with its
principal place of business at 130 Captains Drive, Westbrook,
Connecticut, complains as follows:

## JURISDICTIONAL STATEMENT

   1. Global Energy is a limited liability company of Connec-
ticut whose principal place of business is located in Connecti-
cut.

   2. All members of Global Energy are citizens of Connecti-
cut.

   3. Xethanol Corporation is a Delaware corporation whose
principal place of business is in New York.

   4. Upon information and belief, none of the individual de-

fendants is a Connecticut citizen.

5.    The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7.    Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8.    Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9.    Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times rele- vant to this action.

10.    Defendants represented to Lee Tyrol, the manager of Global Energy, and other representatives of Global Energy that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner.  Defendants misrepresented the state of Xenathol's business operations and the state of the technology it possessed.  They stated that Xethanol owned patents

2

and other technology from which it could manufacture ethanol from bio-mass in a profitable manner. They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

11. The individual defendants made these representations to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings. Defendants also made the following representations in written documents including, but not limited to, the following:

a. In a brochure published in January 2005 entitled "Xethanol: Biomass to Biofuels" that Xethanol was producing 6,000,000 gallons of ethanol a year.

b. A press release dated September 16, 2005 in which Xethanol stated: "Xethanol Corporation seeks to become a leader in the emerging biomass-to-ethanol industry. Its mission is to convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, such as xylitol. Xethanol's strategy is to deploy proprietary bio-technologies that will extract and ferment the sugars trapped in these biomass waste concentrations. Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based processors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production facilities, where it is deploying these technologies."

3

b.    In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol.  Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candles, toothpastes and diabetic regimens.  Xylitol is a co-product derived from biomass-to-ethanol production.  At the present time, we own two ethanol plants in Iowa - Xethanol Bio-oFuels in Blairstwon and Permeate Refining in Hopkinton.  We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol."

c.    In a press release dated August 26, 2005, Xethanol reported that it had acquired the stock of Xylose Technologies, Inc..  The release quoted Christopher d'Arnaud Taylor as saying: "This is far more than a purchase of a milestone technology for lowering the cost of making ethanol from biomass.  Rather, it is the pooling of Xethanol management with a world class scientific team headed by Dr. Jeffries that will continue to develop ways to make xylitol and ethanol more efficiently from biomass.  This alliance with Dr. Jeffries and his team at the USDA Forest Products Lab will enable Xethanol to accelerate development and deployment

4

of its biomass technologies."

    d.  Defendants allowed Xethanol to be featured in the February 2006 issue of Fortune Small Business.  D'Arnaud-Taylor represented that Xethanol had the technology to convert garbage into ethanol, stating "Xethanol isn't just relying on candy for its fuel supply.  This year it plans to introduce a process that will make it possible to turn all kinds of things - including corn-stalks, grass clippings, and old newspapers - into ethanol. . . .Xethanol will use a recently discovered form of yeast to ferment various types of garbage into ethanol.  It has obtained rights to the process from the U. S. Department of Agriculture, where a scientist discovered that yeast in the intestines of a type of beetle can convert plant-based waste product into ethanol.  This year d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge left over from paper milling.  The plants will be able to make in total more than 100 million gallons a year."

    12.  The representations made by defendants to Tyrol and the other Global representatives were false and known by defendants to be false when they were made.

    13.  Defendants made their representations in order to induce plaintiff to rely on them.

    14.  Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested

$250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to bio-fuels business.

15.   As a result of the foregoing, plaintiffs were damaged in an amount exceeding $10,000,000.

Wherefore, Global demands judgment a) compelling defendants to pay $10,000,000 to Global, b) consequential damages, c) pre-judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

ROBERT A. VORT, LLC

Dated: November 23, 2007

_____
        Robert A. Vort
     Attorney for Plaintiff
      2 University Plaza
  Hackensack, New Jersey 07601
        201-342-9501
        201-342-9504 fax
      rvort@vortlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GLOBAL ENERGY AND MANAGEMENT,  :
LLC, a limited liability com-
pany of Connecticut,            :

            Plaintiff,       :      07 Civ. 11049 NRB

        -vs-            :

XETHANOL CORPORATION, CHRISTO-:   AMENDED COMPLAINT and
PHER D'ARNAUD-TAYLOR, JEFFERY    DEMAND FOR JURY TRIAL
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,                        :

           Defendants. :
_____x

     Global Energy and Management, LLC, a limited liability com-
pany of Connecticut ("plaintiff" or "Global Energy"), with its
principal place of business at 130 Captains Drive, Westbrook,
Connecticut, complains as follows:

## JURISDICTIONAL STATEMENT

     1.   Global Energy is a limited liability company of Connec-
ticut whose principal place of business is located in Connecti-
cut.

     2.   All members of Global Energy are citizens of Connecti-
cut.

     3.   Xethanol Corporation is a Delaware corporation whose
principal place of business is in New York.

     4.   Upon information and belief, none of the individual de-

fendants is a Connecticut citizen.

5.    The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7.    Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8.    Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9.    Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times rele- vant to this action.

10.    Defendants represented to Lee Tyrol, the manager of Global Energy, and other representatives of Global Energy that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner.  Defendants misrepresented the state of Xenathol's business operations and the state of the technology it possessed.  They stated that Xethanol owned patents

2

and other technology from which it could manufacture ethanol from bio-mass in a profitable manner. They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

11. The individual defendants made these representations to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings. Defendants also made the following representations in written documents including, but not limited to, the following:

a. In a brochure published in January 2005 entitled "Xethanol: Biomass to Biofuels" that Xethanol was producing 6,000,000 gallons of ethanol a year.

b. A press release dated September 16, 2005 in which Xethanol stated: "Xethanol Corporation seeks to become a leader in the emerging biomass-to-ethanol industry. Its mission is to convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, such as xylitol. Xethanol's strategy is to deploy proprietary bio-technologies that will extract and ferment the sugars trapped in these biomass waste concentrations. Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based processors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production facilities, where it is deploying these technologies."

3

c.    In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol.  Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candles, toothpastes and diabetic regimens.  Xylitol is a co-product derived from biomass-to-ethanol production.  At the present time, we own two ethanol plants in Iowa - Xethanol Bio-Fuels in Blairstwon and Permeate Refining in Hopkinton.  We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol."

d.    In a press release dated August 26, 2005, Xethanol reported that it had acquired the stock of Xylose Technologies, Inc..  The release quoted Christopher d'Arnaud Taylor as saying: "This is far more than a purchase of a milestone technology for lowering the cost of making ethanol from biomass.  Rather, it is the pooling of Xethanol management with a world class scientific team headed by Dr. Jeffries that will continue to develop ways to make xylitol and ethanol more efficiently from biomass.  This alliance with Dr. Jeffries and his team at the USDA Forest Products Lab will enable Xethanol to accelerate development and deployment

4

of its biomass technologies."

    e.  Defendants allowed Xethanol to be featured in the February 2006 issue of Fortune Small Business.  D'Arnaud-Taylor represented that Xethanol had the technology to convert garbage into ethanol, stating "Xethanol isn't just relying on candy for its fuel supply.  This year it plans to introduce a process that will make it possible to turn all kinds of things - including cornstalks, grass clippings, and old newspapers - into ethanol. . . Xethanol will use a recently discovered form of yeast to ferment various types of garbage into ethanol.  It has obtained rights to the process from the U. S. Department of Agriculture, where a scientist discovered that yeast in the intestines of a type of beetle can convert plant-based waste product into ethanol.  This year d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge left over from paper milling.  The plants will be able to make in total more than 100 million gallons a year."

    12.  The representations made by defendants to Tyrol and the other Global representatives were false and known by defendants to be false when they were made.

    13.  Defendants made their representations in order to induce plaintiff to rely on them.

    14.  Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested

$250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to bio-fuels business.

15.   As a result of the foregoing, plaintiffs were damaged in an amount exceeding $10,000,000.

Wherefore, Global demands judgment a) compelling defendants to pay $10,000,000 to Global, b) consequential damages, c) pre-judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

ROBERT A. VORT, LLC

Dated: January 7, 2008

Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
201-342-9504 fax
rvort@vortlaw.com

6

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

January 16, 2008

<u>Via Fax and U.S. Mail</u>

Robert A. Vort, Esq., LLC
2 University Plaza, Suite 200
Hackensack, New Jersey 07601

Re: Global Energy and Management, LLC v. Xethanol Corporation, Christopher
D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein
<u>David Ames, Thomas J. Endres, Robin Buller, David Kreitzer and John Murphy</u>

Dear Mr. Vort:

We write in response to your November 29, 2007 letter and amended
Complaint, dated November 23, 2007 naming as defendants Xethanol Corporation
("Xethanol") and the nine individuals listed above (the "Complaint").

First, you refuse to dismiss any of the individual defendants you name
in the Complaint, stating only that you have amended it "to plead identities and
corporate positions upon information and blief [sic]," and that "[i]f, in the course of
pretrial discovery," you uncover evidence that certain of the individuals you named
as Defendants in the Complaint were improperly named, you "will dismiss" those
individuals "who played no part." Federal Rule of Civil Procedure 11 requires that
you do more than that.

Pursuant to Rule 11(b)(2), in signing that pleading, you are certifying,
to the best of your "knowledge, information, and belief, formed after an inquiry
reasonable under the circumstances," that the "factual contentions [alleged in the
Complaint] have evidentiary support or, if specifically so identified, will likely have
evidentiary support after a reasonable opportunity for further investigation or
discovery." We submit that you have not made that reasonable inquiry.

Your client should know who it is accusing of fraud. Moreover, there
is a surfeit of publicly-available information (e.g., Xethanol Corporation's SEC filings
which are available on its website and other publicly available databases)
confirming that several of the defendants you have named in your pleading should

Paduano & Weintraub llp

Robert A. Vort, Esq., LLC
January 16, 2008
Page 2

be withdrawn.  All of the purported misrepresentations in your Complaint occurred
before April 2006 and the entity at issue, NewEnglandXethanol LLC, was formed in
April 2006.  Yet, two of the named defendants did not become officers or directors
until well after that date and two others were never officers or directors of
Xethanol:

- Thomas Endres became Senior Vice President of Operations of
  Xethanol in September 2006.

- David Ames did not become a director of Xethanol until October
  2006 and did not become an officer of Xethanol until November
  2006.

- John Murphy was never an officer or director of Xethanol.

- David Kreitzer was never an officer or director of Xethanol.

Therefore, none of these individuals could have participated in any of the
wrongdoing alleged in your pleading and all of them should be dropped from your
Complaint.

Second, you did not address the statement in our November 27, 2007
letter that your Complaint fails to state a cause of action under New York law.
Based on a review of the Complaint, it appears that Global is trying to assert a
cause of action sounding in fraud.  Federal Rule of Civil Procedure 11(b)(2) requires
in relevant part that you must certify that "the claims, defenses, and other legal
contentions are warranted by existing law. . . ."

Federal Rule of Civil Procedure 9(b) states unequivocally that "[a] party
must plead fraud and mistake with particularity. . . ."  This requirement repeatedly
has been held by the Second Circuit to require more than conclusory allegations
that a defendant's conduct was fraudulent.  See, e.g., Acito v. Imcera Group, Inc.,
47 F.3d 47, 51 (2d Cir. 1995);  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124,
1128 (2d Cir. 1994); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.
1993).  The Second Circuit has made it imminently clear that, "[a]t a minimum
under Rule 9(b), the plaintiff must '(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state where and when the
statements were made; and 4) explain why the statements were fraudulent.'"
Watral v. Silvernails Farm, LLC, 51 Fed. Appx. 62, 65, 2002 WL 31628504 at *3

PADUANO & WEINTRAUB LLP

Robert A. Vort, Esq., LLC
January 16, 2008
Page 3

(2d Cir. 2002)(dismissing fraud claim for lack of specificity),citing Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999). See also In re Scholastic Corp. Securities Litigation, 252 F.3d 63, 69 (2d Cir.) ("The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."), cert. denied, 534 U.S. 1071 (2001); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)(same).

In especially strong terms, the Second Circuit's decision in Shields reaffirmed that Rule 9(b) must not be ignored even if a consequence is that some suspected misconduct will go unremedied:

> While some fraud may go unpunished as a result of Rule 9(b)'s heightened pleading standard, we recently acknowledged that we cannot eliminate all opportunities for "unremedied fraud" without creating opportunities for "undeserved settlements."

Id., 25 F.3d at 1130 (citations omitted).

Moreover, if more than one defendant – as here – is alleged to have participated in a fraudulent scheme, the complaint must allege facts that specify each defendant's actions in furtherance of the fraud; general allegations against the defendant "group" are insufficient and do not meet the pleading requirements of Rule 9(b). Mills, 12 F.3d at 1175; DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

The Complaint is woefully lacking in any kind of specificity.  Paragraph 10 refers generally to alleged misrepresentations by unspecified defendants, which, according to paragraph 11, were allegedly made "to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings." The Complaint must allege – with specificity – what alleged fraudulent statements were made, which defendants made those fraudulent statements to which Global employee on what dates, and where and when the alleged fraudulent statements were made.  Referring to brochures, press releases and one Form 10KSB from 2005 and early 2006 in paragraph 11 without fulfilling Rule 9(b)'s requirements is fatal to the Complaint.

PADUANO & WEINTRAUB LLP

Robert A. Vort, Esq., LLC
January 16, 2008
Page 4


        In addition, to state a claim for fraud in New York, a plaintiff must allege: (1) a material false representation of an existing fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, (4) reasonable reliance and (5) damages. <u>Cohen v. Koening</u>, 25 F.3d 1168, 1172 (2d Cir. 1994); <u>Channel Master Corp. v. Aluminum Ltd. Sales, Inc.</u>, 4 N.Y.2d 403, 176 N.Y.S.2d 259 (1958). Although Rule 9(b) permits knowledge to be averred generally, the Second Circuit has warned that this aspect of the Rule "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." <u>Wexner v. First Manhattan Co.</u>, 902 F.2d 169, 172 (2d Cir. 1990). The complaint must – and yours does not – "allege facts that give rise to a strong inference of fraudulent intent." <u>Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.</u>, 117 F.3d 655, 663 (2d Cir. 1997). Alleging only in paragraph 12 that "[t]he representations made by defendants to Tyrol and the other [unnamed] Global representatives were false and known by defendants to be false when they were made" does not muster the facts required to fulfill the requirements of Rule 9(b) for pleading fraud with specificity or the reasonable inquiry to fulfill the requirements of Rule 11.

        Finally, the Complaint does provide any basis for the leap of faith from the amount Global allegedly invested in NewEngland – $250,000 – to damages "in an amount exceeding $10,000,000." (<u>See</u> Complaint ¶¶ 14-15)

        The Complaint, we contend, falls far short of the Rule 11(b) strictures requiring your certification that you made a reasonable inquiry into the facts and the law.

        Accordingly, please withdraw the Complaint immediately and send us notice of such withdrawal. We will follow this letter by serving you with our motion for sanctions pursuant to Rule 11(c)(1)(A). To mitigate defendants' expenses, including costs, disbursements and attorneys' fees, we ask that you act voluntarily now.

        Please let us know your intentions no later than January 25, 2008.

                                        Very truly yours,

                                        Katherine B. Harrison

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,

             Plaintiff,                  07 Civ. 11049 NRB

         -vs-           :

XETHANOL CORPORATION, CHRISTO-:
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,                     :

              Defendants. :
————————————————————————x

### PLAINTIFF'S MOTION FOR LEAVE TO
### FILE SECOND AMENDED COMPLAINT

    Global Energy and Management, LLC, a limited liability company of Connecticut, hereby moves for leave to file a second amended complaint.  This application is based on the affidavit of Robert A. Vort.  Notice has not been given to defendants because none of them has been served with a summons or either prior complaint.


Dated: February 12, 2008

                           _____
                              Robert A. Vort
                        Attorney for Plaintiff
                          2 University Plaza
                   Hackensack, New Jersey 07601
                          201-342-9501
                         201-342-9504 fax
                         rvort@vortlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,                    :

              Plaintiff,    :        07 Civ. 11049 NRB

      -vs-                    :

XETHANOL CORPORATION, CHRISTO-:
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,

            Defendants. :
———————————————————————x

CERTIFICATION OF ROBERT A. VORT IN
SUPPORT OF PLAINTIFF'S MOTION FOR
LEAVE TO FILE SECOND AMENDED COMPLAINT

STATE OF NEW JERSEY)
                S.S.
  COUNTY OF BERGEN)

ROBERT A. VORT declares as follows:

    1.    I am a member of the bar of this Court.  I represent
plaintiff in this action.  I submit this certification in support
of plaintiff's motion for leave to file a second amended com-
plaint in this action.

    2.    Plaintiff filed its initial complaint on November 23,
2007.  The action was not assigned to a judge while the clerk
first tendered the assignment to the judge who had handled a
class action complaint against Xethanol and its officers arising

from similar allegations.

3.    It was assigned to the Hon. Naomi Reice Buchwald on or about January 2, 2008.  Shortly afterward, I received a telephone call from someone in Judge Buchwald's chambers.  It appeared that the complaint filed with the Court was either missing a page or that something had been deleted in the process of filing.  Rather than submit a better copy of the original complaint, with what I perceived to be some difficulty of explaining what had happened, I simply filed an amended complaint without leave of Court as Fed.R.Civ.P. 15(a) permits.

4.    When I filed the initial complaint, I sent a copy to Katherine Harrison, Esq. of Paduano & Weintraub, LLC, counsel for the defendants in the prior action, with whom I had been communicating.  Ms. Harrison wrote to me on January 16, 2008 identifying perceived deficiencies in the amended complaint, particularly focusing on the specificity requirement of Fed.R.Civ.P. 9(b).

5.    Rather than drawing the proverbial "line in the sand," I have prepared a second amended complaint with greater specificity in the hope of avoiding a motion on this ground.  A copy of this proposed second amended complaint is attached to this declaration as **Exhibit A**.

6.    As no discovery has yet been propounded, as no answer has yet been filed, I submit that there is no prejudice to defendants if the Court should allow this application.  I also submit

2

that, in light of the circumstances accompanying the filing of
the first amended complaint, this second amended complaint is, in
substance, the first amended complaint.

7.    Pursuant to 28 U.S.C. §1746(2), I declare under penalty
of perjury that the foregoing is true and correct.   Executed on
February 12, 2008.

_____
     Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
     201-342-9501
     201-342-9504 fax
rvort@vortlaw.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,            :

              Plaintiff,    :       07 Civ. 11049 NRB

         -vs-

XETHANOL CORPORATION, CHRISTO-:    SECOND AMENDED COMPLAINT and
PHER D'ARNAUD-TAYLOR, JEFFERY      DEMAND FOR JURY TRIAL
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,

             Defendants. :
_____x

    Global Energy and Management, LLC, a limited liability com-

pany of Connecticut ("plaintiff" or "Global Energy"), with its

principal place of business at 130 Captains Drive, Westbrook,

Connecticut, complains as follows:

### JURISDICTIONAL STATEMENT

    1.   Global Energy is a limited liability company of Connec-

ticut whose principal place of business is located in Connecti-

cut.

    2.   All members of Global Energy are citizens of Connecti-

cut.

    3.   Xethanol Corporation is a Delaware corporation whose

principal place of business is in New York.

    4.   Upon information and belief, none of the individual de-

fendants is a Connecticut citizen.

5.    The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7.    Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8.    Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9.    Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times relevant to this action.

10.    Defendants represented to Lee Tyrol, the manager of Global Energy, and other representatives of Global Energy that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner.  Defendants misrepresented the state of Xenathol's business operations and the state of the technology it possessed.  They stated that Xethanol owned patents

and other technology from which it could manufacture ethanol from bio-mass in a profitable manner. They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

11.    The individual defendants made these representations to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings. Defendants also made the following representations in written documents including, but not limited to, the following:

a.    In a brochure published in January 2005 entitled "Xethanol: Biomass to Biofuels" that Xethanol was producing 6,000,000 gallons of ethanol a year.

b.    In a press release dated August 26, 2005, Xethanol reported that it had acquired the stock of Xylose Technologies, Inc.. The release quoted Christopher d'Arnaud Taylor as saying: "This is far more than a purchase of a milestone technology for lowering the cost of making ethanol from biomass. Rather, it is the pooling of Xethanol management with a world class scientific team headed by Dr. Jeffries that will continue to develop ways to make xylitol and ethanol more efficiently from biomass. This alliance with Dr. Jeffries and his team at the USDA Forest Products Lab will enable Xethanol to accelerate development and deployment of its biomass technologies."

c.    In a press release dated September 16, 2005, Xethanol

stated: "Xethanol Corporation seeks to become a leader in the emerging biomass-to-ethanol industry.  Its mission is to convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, such as xylitol.  Xethanol's strategy is to deploy proprietary bio-technologies that will extract and ferment the sugars trapped in these biomass waste concentrations.  Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based processors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production facilities, where it is deploying these technologies."

   d. On or about February 21, 2006 at the Xethanol office in New York, Christopher D'Arnaud Taylor and Jeffrey Langberg stated that Xethanol possessed the technology for the cellulosic production of ethanol on a commercially profitable basis.

   e. In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol.  Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candles, toothpastes and diabetic regimens.  Xylitol is a co-product derived from biomass-to-ethanol production.  At the present time, we own two ethanol plants in Iowa - Xethanol Bio-

Fuels in Blairstwon and Permeate Refining in Hopkinton.  We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol."

    f.    Defendants allowed Xethanol to be featured in the February 2006 issue of Fortune Small Business.  D'Arnaud-Taylor represented that Xethanol had the technology to convert garbage into ethanol, stating "Xethanol isn't just relying on candy for its fuel supply.  This year it plans to introduce a process that will make it possible to turn all kinds of things - including cornstalks, grass clippings, and old newspapers - into ethanol. . . Xethanol will use a recently discovered form of yeast to ferment various types of garbage into ethanol.  It has obtained rights to the process from the U. S. Department of Agriculture, where a scientist discovered that yeast in the intestines of a type of beetle can convert plant-based waste product into ethanol.  This year d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge left over from paper milling.  The plants will be able to make in total more than 100 million gallons a year."

    g.    On or about May 18, 2006 at the Xethanol office in New York, Christopher D'Arnaud Taylor, Jeffrey Langberg, Lawrence Bellone and Robin Bullers again stated that Xethanol had the

technology with which to engage in the cellulosic production of
ethanol on a commercially profitable basis.

      h.   On or about June 8, 2006 at the Xethanol office in New
York, in the presence of Lee Tyrol, Erik Bartone and Mark DiBel-
la, D'Arnaud Taylor, Langberg, Bellone and Bullers again stated
that Xethanol had the technology with which to engage in the cel-
lulosic production of ethanol on a commercially profitable basis.

      i.   On or about August 11, 2006 at the Xethanol office in
New York, in the presence of Tyrol and Bartone, D'Arnaud Taylor,
Langberg, Bellone and Bullers represented again that Xethanol had
the technology with which to engage in the cellulosic production
of ethanol on a commercially profitable basis.

      j.   On or about September 13, 2006 in a telephone confe-
rence among DiBella, Tyrol, Bartone, DiBella, Langberg, Robert
Bernstein, Bellone and Buller, Langberg, Bernstein, Bellone and
Butler represented that Xethanol had the technology with which to
engage in the cellulosic production of ethanol on a commercially
profitable basis.

      k.   On or about October 12, 2006 at New England Xethanol's
office in Hartford attended by DiBella, Tyro, Bartone, DiBella,
Bellone and Buller, Bellone and Buller represented that Xethanol
had the technology with which to engage in the cellulosic produc-
tion of ethanol on a commercially profitable basis.

      l.   On or about November 14, 2006 at the Xethanol office in
New York, in the presence of Tyrol and Daniel Millstein, David

Amees, Langberg, Bellone and Buller represented that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

12.   The representations made by defendants to Tyrol and the other Global representatives were false and known by defendants to be false when they were made.

13.   Defendants made their representations in order to induce plaintiff to rely on them.

14.   Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested $250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to biofuels business.

15.   As a result of the foregoing, plaintiffs were damaged in an amount exceeding $10,000,000.

Wherefore, Global demands judgment a) compelling defendants to pay $10,000,000 to Global, b) consequential damages, c) pre-

judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

ROBERT A. VORT, LLC

Dated: February 12, 2008

_____
Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
201-342-9504 fax
rvort@vortlaw.com

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,            :

    Plaintiff,    07 Civ. 11049 NRB

  -vs-    :

XETHANOL CORPORATION, CHRISTO-:
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,                        :

    Defendants. :
_____x


# BRIEF in SUPPORT of PLAINTIFF'S MOTION for LEAVE to FILE SECOND AMENDED COMPLAINT


ROBERT A. VORT
RAV 1105
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
rvort@vortlaw.com

Plaintiff Global Energy & Management, LLC submits this memo-
randum in support of its motion for leave to file a second amen-
ded complaint.  The application is grounded in Fed.R.Civ.P. 15(a)
which provides in relevant part:

> A party may amend the party's pleading once as a
> matter of course at any time before a responsive
> pleading is served or, if the pleading is one to
> which no responsive pleading is permitted and the
> action has not been placed upon the trial calen-
> dar, the party may so amend it at any tie within
> 20 days after it is served.  Otherwise a party may
> amend the party's pleading only by leave of court
> or by written consent of the adverse party; and
> leave shall be freely given when justice so requi-
> res.

Global has already amended once.  Hence it requires leave of
court to amend a second time.  No responsive pleading has been
served because the defendants have never been formally served and
have not appeared.  Correspondence between counsel for the defen-
dants and counsel for plaintiff revealed that the defendants were
likely to move to strike the amended complaint for failure to
plead with the specificity required by Fed.R.Civ.P. 9(b).  With-
out conceding the merit of such a motion but wishing to avoid or
minimize motion practice, the second amended complaint attempts
to address the objections set forth by defendants' attorney.

Plaintiff submits that its second amended complaint pleads a
claim upon which relief can be granted, that allowance of this
motion will not prejudice defendants and that allowance of this
motion will not impede this Court in its administration of its
docket.  Rule 15(a) states that "leave (to amend) shall be freely

given when justice so requires."  The Supreme Court confirmed

this in Foman v. Davis, 371 U.S. 178, 182 (1962).  See also, Ruo-

tolo v. City of New York,      F.3d     , 2008 WL 313795 at *6

(2d Cir. 2008), Day v. Morgenthau, 909 F.2d 75, 78 (2d Cir.

1990).

                              Respectfully submitted,


Dated: February 12, 2008      Robert A. Vort

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,

          Plaintiff,              07 Civ. 11049 NRB

        -vs-          :

XETHANOL CORPORATION, CHRISTO-:
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL- :
LER, DAVID KREITZER and JOHN
MURPHY,                :

          Defendants. :
_____x



PLAINTIFF'S MOTION FOR LEAVE TO
FILE SECOND AMENDED COMPLAINT

    Global Energy and Management, LLC, a limited liability

company of Connecticut, hereby moves for leave to file a second

amended complaint.  This application is based on the affidavit of

Robert A. Vort.  Notice has not been given to defendants because

none of them has been served with a summons or either prior

complaint.


Dated: February 12, 2008

                                         Robert A. Vort
                                    Attorney for Plaintiff
                                    2 University Plaza
                                    Hackensack, New Jersey 07601
                                    201-342-9501
                                    201-342-9504 fax
                                    rvort@vortlaw.com

*Endorsement*

*Application granted.*

*Naomi Reice Buchwald, USDJ*

*March 19, 2008*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,                :

              Plaintiff,        :        07 Civ. 11049 NRB

      -vs-                        :

XETHANOL CORPORATION, CHRISTO-:    SECOND AMENDED COMPLAINT and
PHER D'ARNAUD-TAYLOR, JEFFERY      DEMAND FOR JURY TRIAL
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
THOMAS J. ENDRES, ROBIN BUL-  :
LER, DAVID KREITZER and JOHN
MURPHY,                       :

            Defendants. :
_____x

    Global Energy and Management, LLC, a limited liability com-

pany of Connecticut ("plaintiff" or "Global Energy"), with its

principal place of business at 130 Captains Drive, Westbrook,

Connecticut, complains as follows:

JURISDICTIONAL STATEMENT

    1.    Global Energy is a limited liability company of Connec-

ticut whose principal place of business is located in Connecti-

cut.

    2.    All members of Global Energy are citizens of Connecti-

cut.

    3.    Xethanol Corporation is a Delaware corporation whose

principal place of business is in New York.

    4.    Upon information and belief, none of the individual de-

fendants is a Connecticut citizen.

5.    The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7.    Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8.    Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9.    Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times relevant to this action.

10.    Defendants represented to Lee Tyrol, the manager of Global Energy, and other representatives of Global Energy that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner.  Defendants misrepresented the state of Xenathol's business operations and the state of the technology it possessed.  They stated that Xethanol owned patents

2

and other technology from which it could manufacture ethanol from bio-mass in a profitable manner. They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

11. The individual defendants made these representations to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings. Defendants also made the following representations in written documents including, but not limited to, the following:

a. In a brochure published in January 2005 entitled "Xethanol: Biomass to Biofuels" that Xethanol was producing 6,000,000 gallons of ethanol a year.

b. In a press release dated August 26, 2005, Xethanol reported that it had acquired the stock of Xylose Technologies, Inc.. The release quoted Christopher d'Arnaud Taylor as saying: "This is far more than a purchase of a milestone technology for lowering the cost of making ethanol from biomass. Rather, it is the pooling of Xethanol management with a world class scientific team headed by Dr. Jeffries that will continue to develop ways to make xylitol and ethanol more efficiently from biomass. This alliance with Dr. Jeffries and his team at the USDA Forest Products Lab will enable Xethanol to accelerate development and deployment of its biomass technologies."

c. In a press release dated September 16, 2005, Xethanol

stated: "Xethanol Corporation seeks to become a leader in the emerging biomass-to-ethanol industry. Its mission is to convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, such as xylitol. Xethanol's strategy is to deploy proprietary bio-technologies that will extract and ferment the sugars trapped in these biomass waste concentrations. Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based processors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production facilities, where it is deploying these technologies."

d. On or about February 21, 2006 at the Xethanol office in New York, Christopher D'Arnaud Taylor and Jeffrey Langberg stated that Xethanol possessed the technology for the cellulosic production of ethanol on a commercially profitable basis.

e. In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol. Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candles, toothpastes and diabetic regimens. Xylitol is a co-product derived from biomass-to-ethanol production. At the present time, we own two ethanol plants in Iowa - Xethanol Bio-

4

Fuels in Blairstwon and Permeate Refining in Hopkinton.  We also
own several proprietary bio-extraction, bio-separation and bio-
fermentation technologies that are targeted at reducing costs
throughout the entire ethanol production process as well as enab-
ling the conversion of biomass to ethanol and xylitol."

    f.    Defendants allowed Xethanol to be featured in the Feb-
ruary 2006 issue of Fortune Small Business.  D'Arnaud-Taylor rep-
resented that Xethanol had the technology to convert garbage into
ethanol, stating "Xethanol isn't just relying on candy for its
fuel supply.  This year it plans to introduce a process that will
make it possible to turn all kinds of things - including corn-
stalks, grass clippings, and old newspapers - into ethanol. . .
Xethanol will use a recently discovered form of yeast to ferment
various types of garbage into ethanol.  It has obtained rights to
the process from the U. S. Department of Agriculture, where a
scientist discovered that yeast in the intestines of a type of
beetle can convert plant-based waste product into ethanol.  This
year d'Arnaud-Taylor intends to begin opening plants on the East
Coast that will use yeast from the beetles to brew ethanol from
sludge left over from paper milling.  The plants will be able to
make in total more than 100 million gallons a year."

    g.    On or about May 18, 2006 at the Xethanol office in New
York, Christopher D'Arnaud Taylor, Jeffrey Langberg, Lawrence
Bellone and Robin Bullers again stated that Xethanol had the

5

technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

h.  On or about June 8, 2006 at the Xethanol office in New York, in the presence of Lee Tyrol, Erik Bartone and Mark DiBella, D'Arnaud Taylor, Langberg, Bellone and Bullers again stated that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

i.  On or about August 11, 2006 at the Xethanol office in New York, in the presence of Tyrol and Bartone, D'Arnaud Taylor, Langberg, Bellone and Bullers represented again that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

j.  On or about September 13, 2006 in a telephone conference among DiBella, Tyrol, Bartone, DiBella, Langberg, Robert Bernstein, Bellone and Buller, Langberg, Bernstein, Bellone and Butler represented that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

k.  On or about October 12, 2006 at New England Xethanol's office in Hartford attended by DiBella, Tyro, Bartone, DiBella, Bellone and Buller, Bellone and Buller represented that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

l.  On or about November 14, 2006 at the Xethanol office in New York, in the presence of Tyrol and Daniel Millstein, David

Amees, Langberg, Bellone and Buller represented that Xethanol had the technology with which to engage in the cellulosic production of ethanol on a commercially profitable basis.

12.    The representations made by defendants to Tyrol and the other Global representatives were false and known by defendants to be false when they were made.

13.    Defendants made their representations in order to induce plaintiff to rely on them.

14.    Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested $250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to biofuels business.

15.    As a result of the foregoing, plaintiffs were damaged in an amount exceeding $10,000,000.

Wherefore, Global demands judgment a) compelling defendants to pay $10,000,000 to Global, b) consequential damages, c) pre-

judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

ROBERT A. VORT, LLC

Dated: March   , 2008

Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
201-342-9504 fax
rvort@vortlaw.com

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

March 27, 2007

<u>Via Fax and U.S. Mail</u>

Robert A. Vort, Esq.
2 University Plaza, Suite 200
Hackensack, New Jersey  07601

   Re: Global Energy and Management, LLC v. Xethanol Corporation,
    Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone,
    Louis B. Bernstein, David Ames, Thomas J. Endres, Robin Buller,
    <u>David Kreitzer and John Murphy, 1:07 Civ. 11049 (S.D.N.Y.) (NRB)</u>

Dear Mr. Vort:

   We write in response to your Second Amended Complaint, dated March 2008 (the "Second Amended Complaint"), naming as defendants Xethanol Corporation ("Xethanol") and the nine individuals listed above.  Once again, we ask, as we did on November 27, 2007, and again on January 16, 2008, that you withdraw what is now your third complaint concerning the above-referenced matter.  (Copies of my previous letters to you are attached.)

   The Second Amended Complaint is identical to the First Amended Complaint to which we objected, except that you added subparagraphs 11(d) and 11(g) through (l).  This letter addresses the deficiencies of these subparagraphs.

   Pursuant to Rule 11(b)(2), in signing the Second Amended Complaint, you are certifying, to the best of your "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the "factual contentions [alleged in the Complaint] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." We submit that you have not, once again, made that reasonable inquiry in the Second Amended Complaint.

   First, you allege in paragraph 14 of the Second Amended Complaint as follows:

PADUANO & WEINTRAUB LLP

Robert A. Vort, Esq.
March 27, 2008
Page 2

Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested $250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to bio-fuels business.

On June 23, 2006, Lee R. Tyrol, as President and CEO of Global, entered into an Organizational Agreement with Xethanol regarding NewEngland Xethanol, LLC in which Global agreed, *inter alia*, to invest $1.5 million in three installments, the first one of which was in to be in the amount of $250,000.00. (The Agreement is contained in one of Xethanol's SEC filings, which is available on its website and other publicly-available databases.) Any statements on which Global could allegedly have relied "to its detriment" in allegedly investing $250,000.00 therefore had to have occurred on or before June 23, 2006.

Despite that fact, four of the seven subparagraphs on which Global claims it relied "to its detriment," 11(i) through 11(l) of the Second Amended Complaint, all reference events occurring after June 23, 2006. Global could therefore not have relied "to its detriment" on the alleged statements in those subparagraphs. Therefore, these allegations should be dropped from the Second Amended Complaint.

Second, there are no allegations of wrongdoing directed against three of the defendants you name in the Second Amended Complaint, Thomas Endres, John Murphy and David Kreitzer. Therefore, these three individuals could not have participated in any of the wrongdoing alleged in your pleading, and they should be dropped from the Second Amended Complaint.

Third, two of the other defendants you accuse of wrongdoing, David Ames and Louis Bernstein, allegedly made fraudulent statements only after June 23, 2006 – David Ames on November 14, 2006 (¶ 11(l)) and Louis Bernstein on September 13, 2006 (¶ 11(j)). (Moreover, as we wrote in our January 16, 2008 letter to you, Mr. Ames did not become a director of Xethanol until October 2006 and an officer of Xethanol until November 2006 – well after Global signed its agreement with Xethanol.) Therefore, these two individuals could not have participated in any of the wrongdoing alleged in your pleading, and they should be dropped from the Second Amended Complaint.

Fourth, you still have not addressed the Rule 9(b) problems we pointed out in our November 27, 2007 and January 16, 2008 letters. Based on a review of the Second Amended Complaint, it appears that Global is still trying to assert a cause of action sounding in fraud. Federal Rule of Civil Procedure 11(b)(2) requires in relevant part that you must certify that "the claims, defenses, and other legal contentions are

PADUANO & WEINTRAUB LLP

Robert A. Vort, Esq.
March 27, 2008
Page 3

warranted by existing law. . . ."  The case law regarding your obligation to plead fraud with particularity under Rule 9(b) is set forth in our attached January 16, 2008 letter to you and will not be repeated herein.

Paragraph 10 in the Second Amended Complaint still refers generally to alleged misrepresentations by the individual defendants, which, in paragraph 11 were allegedly made "to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings."  The Second Amended Complaint must allege – with specificity – what alleged fraudulent statements were made, which individual defendants made those fraudulent statements to which Global employee, and where and when the alleged fraudulent statements were made.  Referring to brochures, press releases and one Form 10KSB from 2005 and early 2006 in paragraph 11 without fulfilling Rule 9(b)'s requirements remains fatal to the Second Amended Complaint.

The three subparagraphs that pre-date the June 23, 2006 agreement still lack the specificity Federal Rule of Civil Procedure 9(b) requires.  For example, subparagraphs 11(d) and 11(g) do not allege to which Global employee the alleged fraudulent statements were made.  Moreover, in subparagraph 11(g), you state that, *inter alia*, Lawrence Bellone and Robin Buller "again stated that Xethanol had the technology," even though this is the first time you allege in the Second Amended Complaint that Messrs. Bellone and Buller made allegedly fraudulent statements.

Moreover, in paragraph 10 of the Second Amended Complaint, you allege that

Defendants misrepresented the state of Xenathol's [sic] business operations and the state of the technology it possessed.  They stated that Xethanol owned patents and other technology from which it could manufacture ethanol from bio-mass in a profitable manner.  They also stated that they were currently producing 6,000,000 gallons of ethanol a year which was not true.

Nowhere in the Second Amended Complaint do you identify which of the individual defendants made any of those statements to which Global employees, or where and when the alleged fraudulent statements were made.  None of the seven new subparagraphs refer to any of the alleged misrepresentations in paragraph 10.  Instead, the seven subparagraphs simply repeat the allegation that certain of the individual defendants "represented that Xethanol had the technology for the cellulosic production of ethanol on a commercially profitable basis." (Second Amended Complaint ¶¶ 11 (d), (g), (h), (i), (j), (k) and (l))

PADUANO & WEINTRAUB LLP

Robert A. Vort, Esq.
March 27, 2008
Page 4


In addition, the Second Amended Complaint still does not provide any basis for how Global, which allegedly invested $250,000 in NewEngland Xethanol, could possibly have suffered damages "in an amount exceeding $10,000,000.00." (See Second Amended Complaint ¶¶ 14-15.)

The Second Amended Complaint still falls far short of the Rule 11(b) strictures requiring your certification that you made a reasonable inquiry into the facts and the law.

Accordingly, please withdraw the Second Amended Complaint immediately and send us notice of such withdrawal. If you do not so, then we will serve you with our motion for sanctions pursuant to Rule 11(c)(1)(A). To mitigate defendants' expenses, including costs, disbursements and attorneys' fees, we ask that you withdraw the Second Amended Complaint by the close of business on Friday, March 28, 2008.


Very truly yours,

Katherine B. Harrison


[Attachments]

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

April 21, 2008

By Fax
The Honorable Naomi R. Buchwald
United States District Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2270
New York, New York 10007-1312

Re: Global Energy and Management, LLC v. Xethanol
Corporation, et al.; 1:07 Civ. 11049 (S.D.N.Y.)(NRB)

Your Honor:

We represent Defendant Xethanol Corporation ("Xethanol") in the above-referenced matter. Pursuant to your Honor's Individual Practices, we request a pre-motion conference for permission to move, pursuant to Fed. R. Civ. P. Rules 8(a), 9(b) and 12(b)(6), to dismiss the Second Amended Complaint, dated March 2008 (the "Complaint"), of Plaintiff Global Energy and Management, LLC ("Global") for failure to plead fraud with the particularity Rule 9(b) requires. Global alleges – in utterly vague and conclusory terms – that, in reliance on Defendants' representations as to Xethanol's business, Global invested $250,000 in New England Xethanol ("New England") and somehow suffered damages "in an amount exceeding $10,000,000." (Complaint ¶ 15). Because the Complaint fails to meet the most basic elements of Rule 9(b), it should be dismissed.

Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[1]

First, Global alleges that it "relied on the representations of defendants to its detriment and, in reliance on their representations, invested $250,000 into [NewEngland], a limited liability company formed by Global and by Xethanol. . . ." (Complaint ¶ 14) On June 23, 2006, Lee Tyrol, Global's President and CEO. signed an

---

[1] Matsumura v. Benihana Nat'l Corp., 2008 WL 282021 *4 (S.D.N.Y. Jan. 25, 2008)(Buchwald, J.), citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

PADUANO & WEINTRAUB LLP

The Honorable Naomi R. Buchwald
April 21, 2008
Page 2

Organizational Agreement with Xethanol regarding NewEngland. Global agreed to invest $1.5 million in three installments; the first one for $250,000. (A copy of the Agreement is attached as Exhibit A.)[2] Any statements on which Global thus relied "to its detriment" in allegedly investing $250,000 had to have occurred on or before June 23, 2006. Despite that fact, the alleged misstatements in four of the subparagraphs on which Global claims it relied, 11(i) through 11(l), all reference events occurring after June 23, 2006. Global could thus not have relied "to its detriment" on those alleged misstatements.[3]

Second, there are no allegations of wrongdoing whatsoever against defendants Thomas Endres, John Murphy or David Kreitzer.[4] Moreover, defendants David Ames and Louis B. Bernstein allegedly made fraudulent statements after the June 23, 2006 agreement was signed – David Ames on November 14, 2006 (¶ 11(l)) and Louis B. Bernstein on September 13, 2006 (¶ 11(j)).

Third, paragraph 10 refers to alleged misrepresentations, which, in paragraph 11 were made "to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings." The Complaint does not allege with specificity the fraudulent statements made, which individual defendants made those statements to which Global employee on what dates, and where and when they were allegedly made.[5]

---

[2] The Organizational Agreement for NewEngland is in Xethanol's SEC filings. A "complaint is deemed to include. . . 'public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'" Yukos Oil Co. Securities Litigation, 2006 WL 3026024 *12 (S.D.N.Y. 2006); Compagnia Importazioni Esportazioni Rapresentanze v. L-3 Communications Corp., 2007 WL 2244062 *4 (S.D.N.Y. July 31, 2007)(Buchwald, J.); see also F.R.E. 201.

[3] Kulas v. Adachi, 1997 WL 256957 (S.D.N.Y. May 16, 1997)(misrepresentations allegedly made after plaintiff entered into contract not material to decision to enter contract; plaintiff cannot plead facts showing materiality of alleged misstatements); see also Spencer Trask Software & Information Services LLC v. Rpost Int'l Ltd., 383 F.Supp.2d 428, 453 (S.D.N.Y. 2003)(cannot claim reliance on alleged misstatements made after contract signed).

[4] See In re Geopharma, Inc. Securities Litigation, 399 F.Supp.2d 432, 445 (S.D.N.Y. 2005)(lawsuit dismissed against chairman "not mentioned at all in the Complaint except to name him as a defendant.").

[5] If more than one defendant allegedly participated in a fraudulent scheme, the plaintiff must allege facts specifying each defendant's fraudulent actions; general allegations are insufficient and do not meet Rule 9(b)'s pleading requirements. Mills, 12 F.3d at 1175; DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).

PADUANO & WEINTRAUB LLP

The Honorable Naomi R. Buchwald
April 21, 2008
Page 3


The three subparagraphs pre-dating the June 23, 2006 agreement lack the specificity Rule 9(b) requires.  For example, subparagraphs 11(d) and 11(g) do not allege to which Global employee the alleged fraudulent statements were made.  In subparagraph 11(g), Global alleges that Lawrence Bellone and Robin Bullers "again stated that Xethanol had the technology," even though this is the first time Global alleged in the Complaint that they made fraudulent statements.

In paragraph 10, Global alleges that defendants made certain misrepresentations, but it does not , however, identify which of the individual defendants made the allegedly fraudulent statements to which Global employees, and where and when they were allegedly made.  Nothing in paragraph 11 refers to the alleged misrepresentations in paragraph 10.  Seven of the subparagraphs simply repeat the allegation that certain of the individual defendants "represented that Xethanol had the technology for the cellulosic production of ethanol on a commercially profitable basis."

Fourth, the Complaint provides no basis for how Global's alleged investment of $250,000, or any of defendants' actions, resulted in damages "exceeding $10,000,000.00." (Complaint ¶¶ 14-15.)  Global has failed to allege loss causation.[6]

Finally, though the relationship between the parties is based on their contract, Global improperly attempts to "transform a breach of contract claim into a fraud claim," which it may not do under the case law.[7]

For the reasons stated above, we therefore seek the Court's permission to move to dismiss the Complaint.

Respectfully submitted,

Katherine B. Harrison

Attachment

cc:    Robert A. Vort, Esq. (via fax; w/attachment)

---

[6] See Spencer, 383 F.Supp.2d at 457-58 (complaint dismissed in part for failure to allege loss causation: "Courts in this District and this Circuit do require more than merely conclusory allegations of injury to state a claim for fraud.  These Courts have required that the plaintiffs include facts in their complaint from which loss causation can be inferred.").

[7] Kulas, 1997 WL 256957 *9; see also Global Media Corp. v. Gateway Distributors, Ltd., 2007 WL 2589535 *4 (S.D.N.Y. Aug. 28, 2007).

8-K 1 v046318_8k.htm

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549
### FORM 8-K
### CURRENT REPORT PURSUANT
### TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): June 23, 2006

**Xethanol Corporation**

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**

(State or Other Jurisdiction of Incorporation)

| | |
|---|---|
| **000-50154** | **84-1169517** |
| (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **1185 Avenue of the Americas**<br>**New York, New York** | **10036** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(646) 723-4000**

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## SECTION 1 REGISTRANT'S BUSINESS AND OPERATIONS

### ITEM 1.01. Entry into a Material Definitive Agreement.

On June 23, 2006, Xethanol Corporation ("Xethanol") entered into an Organizational Agreement (the "Organizational Agreement") with Global Energy and Management LLC, a Connecticut limited liability company ("Global"), pursuant to which they organized a Delaware limited liability company known as NewEnglandXethanol, LLC ("NewEnglandXethanol"). On the same date, Xethanol and Global entered into an Operating Agreement (the "Operating Agreement") that relates to the operation and management of NewEnglandXethanol. Xethanol and Global organized NewEnglandXethanol to develop and operate facilities for the production of ethanol in the States of Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont and Maine. Xethanol has granted NewEnglandXethanol and each Special LLC (as defined below) the non-exclusive right to use all Xethanol technology that may be useful for the development and operation of such facilities in the geographic areas in which NewEnglandXethanol intends to construct its facilities. Xethanol and Global each own a 50% membership interest in NewEnglandXethanol. NewEnglandXethanol will be managed by a Board of Managers, which will initially consist of four members. Xethanol and Global will each have the right to designate two of the members of the board.

Significant provisions in the Organizational Agreement include:

**Special Purpose Limited Liability Companies.** Each of NewEnglandXethanol's facilities will be constructed and operated by a special purpose limited liability company (a "Special LLC"). The manager of each Special LLC will be Lee A. Tyrol (a member of Global) or, if Mr. Tyrol is unable to serve, Global or its designee. Xethanol and Global will provide each Special LLC with certain services that are set forth in the Organizational Agreement in consideration of which each Special LLC will pay management fees to Xethanol and Global, also as set forth in the Organizational Agreement. Each Special LLC will also pay Xethanol a technology access fee as set forth in the Operating Agreement in consideration of Xethanol's license of its technologies to the Special LLC.

**Capitalization.** Global has agreed to contribute an aggregate of $1,500,000 to the capital of NewEnglandXethanol in three installments. The initial installment of $250,000 was paid upon the execution of the Organizational and Operating Agreements; the second installment of $250,000 is payable within 90 days thereafter; and the final installment of $1,000,000 is payable upon approval by Xethanol and Global of the construction of the first facility to be developed by NewEnglandXethanol.

**Warrants to Purchase Xethanol Common Stock.** Xethanol has issued to Global a warrant to purchase 20,000 shares of Xethanol's common stock, par value $.001 per share ("Common Stock"), at a purchase price of $6.85 per share that is first exercisable on June 23, 2007 (subject to a right of immediate exercise upon a Change of Control Event (as defined in the Organizational Agreement)) and is exercisable until June 23, 2010. Xethanol has granted Global certain registration rights with respect to the shares underlying the warrant.

**Exchange of Global Interests.** Upon a Change of Control Event, Global will have the right to exchange its interest in NewEnglandXethanol for shares of Common Stock, at an exchange rate to be agreed upon by Xethanol and Global or, if they cannot agree, at a rate based upon the appraised value of Global's interest in NewEnglandXethanol and 95% of the market price of the Common Stock for the 15 days preceding the completion of the valuation of Global's interest in NewEnglandXethanol.

Xethanol has agreed to permit Global to require Xethanol to exchange Global's interest in NewEnglandXethanol for shares of Common Stock at any time beginning June 23, 2007. The interests will be exchanged at a rate to be agreed upon by Xethanol and Global or, if they cannot agree, at a rate based upon the appraised value of Global's interest in

NewEnglandXethanol and 90% of the market price of the Common Stock for the 15 days preceding the completion of the valuation of Global's interest in NewEnglandXethanol.

2

Reference is made to Exhibits 1.1 and 1.2 to this Current Report on Form 8-K for the complete terms of the Organizational Agreement and the Operating Agreement. A press release announcing the organization of NewEnglandXethanol was issued by Xethanol on June 27, 2006 and is attached hereto as Exhibit 99.1.

## SECTION 3 - SECURITES AND TRADING MARKETS

### ITEM 3.02. Unregistered Sales of Equity Securities

On June 23, 2006, Xethanol issued to Global a warrant (the "Warrant") to purchase 20,000 shares of Common Stock at an exercise price of $6.85 per share. The Warrant is first exercisable on June 23, 2007 (subject to a right of immediate exercise upon a Change of Control Event) and is exercisable until June 23, 2010. The Warrant was issued in connection with and pursuant to the Organizational Agreement without consideration for the Warrant other than the obligations of Global under the Organizational Agreement. Xethanol did not receive any cash in connection with the issuance of the Warrant. No commissions were paid or payable with respect to the issuance of the Warrant.

Exemption from registration of the Warrant specified in the preceding subparagraph (a) is claimed under Section 4 (2) of the Securities Act of 1933, as amended (the "Act") because the transaction did not involve a public offering and was therefore exempt from the registration requirements of Section 5 of the Act.

The Warrant is attached to this Current Report on Form 8-K as Exhibit 3.1.

**SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS**

**ITEM 9.01. Exhibits**

      Following is the Index of Exhibits furnished in accordance with Item 601 of Regulation S-K, filed as part of this Current Report on Form 8-K or incorporated by reference herewith:

1.1      Organizational Agreement, dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy and Management LLC.

1.2      Operating Agreement dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy and Management LLC.

3.1      Warrant dated as of June 23, 2006, issued by Xethanol Corporation to Global Energy and Management LLC.

99.1      Press release issued by Xethanol Corporation on June 27, 2006.

4

## SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Xethanol Corporation

Date: June 27, 2006                         By:  /s/ Lawrence S. Bellone

Lawrence S. Bellone
Chief Financial Officer

5

EX-1.1 2 v046318_ex1-1.htm

**Exhibit 1.1**

**Organizational Agreement, dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy and Management LLC.**

## ORGANIZATIONAL AGREEMENT

This Organizational Agreement is made as of the 23rd day of June, 2006 by and among Xethanol Corporation, a Delaware corporation with an address at 1185 Avenue of the Americas, 20th Floor, New York, NY 10036 ("Xethanol"), Global Energy and Management, LLC, a Connecticut limited liability company with an address at 130 Captains Drive, Westbrook, CT 06498 ("Global") and NewEnglandXethanol, LLC, a Delaware limited liability company with an address at 130 Captains Drive, Westbrook, CT 06498 (the "Company").

### RECITALS:

I. Xethanol and Global (each, a "Member" and, together, the "Members") have formed the Company for the purpose of initiating, developing, investing in and managing projects for the production of ethanol in the States of Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont and Maine (the "Territory"); (ii) engaging in any or all general business activities that may be related or incidental to, or may appear conducive or expedient for the accomplishment of, the foregoing ; and (iii) engaging in any business or activity that might be engaged in or carried on by a limited liability company formed under the Act. Each Member will have an interest in the Company as set forth in this Agreement.

II. The Members have agreed upon the method by which they will manage the ethanol projects to be engaged in by the Company and upon certain financial obligations that they will have to each other and the Company. They wish to set forth their understandings and agreement in this Agreement.

NOW, THEREFORE, in order to evidence their mutual agreements and understandings concerning the subject matter hereof, the parties hereto agree as follows:

1. Organization of the Company.

    1.1    Organization and Initial Ownership Interests. On the date hereof, the parties will execute the NewEnglandXethanol Operating Agreement (the "Operating Agreement") that is attached to this Agreement as Exhibit A and will take or cause to be taken all such further action as may be necessary or proper to effect the existence of the Company under the laws of the State of Delaware. Pursuant to the Operating Agreement, Xethanol will own 5 Units of Interest as a Class A Member in the Company and Global will own 5 Units of Interest as a Class B Member in the Company. In consideration for such Interests,

        1.1.1    Global will contribute the sum of $1,500,000 to the capital of the Company. Such sum will be payable in three installments. The first installment of $250,000 will be payable concurrently with the execution of this Agreement and the Operating Agreement (the "Effective Date"). The second installment of $250,000 will be payable ninety (90) days from the Effective Date. The third installment of $1,000,000 will be payable upon on the date on which the construction of the first Facility (as hereinafter defined) is approved by the Members.

1.1.2    Xethanol will grant the Company and each Special LLC (as hereinafter defined) a non-exclusive license to use (without the right to sublicense) in the Territory all of its intellectual property that is useful in developing or operating Facilities including, but not limited to, patents and know-how relating to ethanol production and the engineering of biorefineries for ethanol production, feedstock analysis and procurement, plant location, strategic alliances, customers, corporate branding, plant management, recruitment and training. Xethanol will provide such information to the Company and to each Special LLC upon request, and will furnish them with reasonable assistance to use such information for the purposes of development and operation of the Facility being developed by the relevant Special LLC. All of such information shall be deemed to be, and shall be treated by Global, the Company and each Special LLC as, Confidential Information in accordance with the provisions of Section 5.1 of this Agreement.

2. Project Management. The Company, with the assistance of Global and Xethanol, will be responsible for site selection and acquisition, the development of facilities for the production of ethanol and the management of those facilities, in accordance with the following:

2.1    The facilities which the Company will develop pursuant to this agreement will be biorefineries for the production of ethanol, each having an annual production capacity of 40,000,000 barrels of ethanol per year (each, a "Facility").

2.2    The Company and Global will identify sites within the Territory for the proposed location of Facilities. Upon identification of each site, the Company will so notify the Members and, upon approval of such site by the Members, the Company and Global will commence negotiation for the acquisition or lease of such site.

2.3    Upon identification of a site for a Facility, the Company and Global shall cause a Bankable Feasibility Study with respect to such facility and its operation, to determine whether or not such Facility can support a stand-alone capital structure (each, a "Study"). Among other things, each Study will set forth the risks and returns applicable to each Facility, the terms and conditions for the financing of such facility and a preliminary analysis of available feedstock, pricing and quantity. The Study will include financial modeling illustrating total required capital investment for the Facility and proposed financing terms, operating cash flow scenarios, debt servicing (with coverages) and returns on membership interests.

2.4    If the Company and Global are successful in procuring a site, the Study applicable to such site is acceptable to both Global and Xethanol and the Company has been able to procure financing for the construction and operation of the applicable Facility that is acceptable to both Global and Xethanol, then the Company will form a single-purpose limited liability company (a "Special LLC"), of which the Company will be the sole Member, which will (a) acquire or lease that site, (b) conduct such environmental and other tests as are required, (c) engage engineers, architects and other professional advisors as may be necessary for the development of a Facility on such site, (d) enter into contracts for the construction of, and effect the construction of, such Facility and (e) operate such Facility, directly or under contract with third parties.

2.5    The Company will, and Global and Xethanol will assist the Company to, raise investment capital from third parties for purposes of funding the development and operation of each Facility. Xethanol will have the right, but not the obligation, to invest in any or all of such Special LLCs, on the same terms as are offered to third party investors. Such investment may be made, at the option of Xethanol, in either the applicable Special LLC or the Company, in which latter event the percentage interest to be obtained by Xethanol in the Company shall be agreed upon by Global and Xethanol or, in the absence of such agreement, determined by arbitration held before a single arbitrator sitting in New York, NY, and appointed and acting in accordance with the commercial arbitration rules of the American Arbitration Association then in effect.

2.6    Subject to obtaining necessary approvals from Xethanol as the Class A Member of the Company, Global shall cause the commencement of construction (or, in the case of conversion of an existing facility to become a Facility, the commencement of such conversion) of at least one (1) Facility during 2006 and shall cause the commencement of construction (or, in the case of conversion of an existing facility to become a Facility, the commencement of such conversion) of at least one (1) additional Facility during 2007.

2.7    Lee A. Tyrol, a Member of Global ("Tyrol"), or, if Tyrol is unable to serve, Global or another person designated by Global and reasonably acceptable to Xethanol, will be the Manager of each Special LLC; provided, however, that such Manager, will not have the right without the consent of the Members to:

　　2.7.1    lease, license or purchase any material assets;

　　2.7.2    sell, lease, license or make any other disposition of any material assets of the Special LLC, other than in the ordinary course of its business;

　　2.7.3    borrow money which is not for use in the ordinary course of business of the Special LLC;

　　2.7.4    make any loan on behalf of the Special LLC, or advance credit on behalf of the Special LLC (other than in the ordinary course of its business), or authorize the guarantee by the Special LLC of any obligation of any third party; or

　　2.7.5    issue any additional Membership Interests in the Special LLC, or the right or option to acquire any such interests, or any security convertible into such interests, other than (a) to employees, consultants and others providing services to the Special LLC, pursuant to plans or other arrangements approved by the Member.

　　2.7.6    Confess a judgment against the Special LLC, or the consent to the entry of any such judgment;

-3-

2.7.7    on behalf of the Special LLC, enter into any transaction or agreement of any nature, or modifying any agreement, with any person or firm which is an Affiliate of Global

2.8    Global will provide the Company and each Special LLC with the services set forth on Schedule A to this Agreement.

2.9    The Company will compensate Global and Xethanol for the services rendered pursuant to this Section 2 (other than, in the case of Xethanol, Sections 2.6 and 2.7) by payment to them of the amounts set forth in Sections 3.2 and 3.2, respectively. The Company will provide Global with such office space and secretarial and administrative assistance as he shall reasonably require in rendering his services as required hereunder.

3  Financial Obligations.

3.1    In consideration of the services to be rendered by Global as provided in Section 2.4., the Company will cause each Special LLC to pay Global a management fee as follows:

3.1.1    Commencing on the date that such Special LLC acquires title or enters into a long-term lease to the property on which a Facility is to be built and ending on the earlier of (a) the date on which the applicable Facility first produces ethanol in commercial quantities or (b) the Company elects to discontinue development of that Facility, a monthly fee of $15,000 per month, which fee shall be payable on the tenth day of each month during the period.

3.1.2    Commencing on the date that such Special LLC first produces ethanol in commercial quantities and thereafter until the first calendar month in which the operating cash flow of such Special LLC is positive, a monthly fee of $15,000 per month, which fee shall be payable on the tenth day of each month during the period.

3.1.3    Commencing with the first month following the first calendar month in which the operating cash flow of such Special LLC is positive, a monthly fee equal to the greater of (s) $15,000 or (b) the sum of (x) 3% of the gross revenues of the applicable Facility and (y) the net income (determined in accordance with generally accepted accounting principles consistently applied) of such Special LLC with respect to such month, which fee shall be payable on the tenth day of each month during the period.

3.2    In consideration of the services to be rendered by Global in accordance with Section 2.1, commencing on the Effective Date, the Company will pay Global the sum of $15,000 per month, plus expenses reasonably incurred by Global in rendering such services.

3.3    In consideration of the services to be rendered by Xethanol in accordance with Sections 2.1 through 2.5, inclusive, commencing on the date on which each Project is approved by the Company and ending on the date on which the Plant constructed as part of such Project first produces ethanol for commercial sale, the Company will pay Xethanol the sum of $10,000 per month with respect to each such Project.

-4-

3.3.1    In consideration of the license granted by Xethanol in Section 2.5, the Company and each Special LLC shall, jointly and severally, pay Xethanol the amounts set forth Section 5.2.4 of the Operating Agreement.

4 Equity Interests.

4.1    Concurrently with the execution of this Agreement, Xethanol shall issue Global warrants to purchase 20,000 shares of Xethanol's Common Stock, par value $.001 per share. Such warrants shall be identical in form to the Class B Warrants issued to certain investors and attached as an exhibit of Xethanol's form 8-K filed with the Securities and Exchange Commission on April 7, 2006, except that:

4.1.1  Such warrants shall have an exercise price of $6.85 per share;

4.1.2  Such warrants shall be exercisable for a 3-year term commencing on the first anniversary of the date of this Agreement; provided, however, that such warrants shall become exercisable immediately upon the occurrence of a Change of Control Event, as defined in Section 4.2.

Subject to (a) compliance with applicable securities laws and regulations and (b) the consent of Xethanol, which consent shall not e unreasonably withheld, Global may distribute (or direct that Xethanol issue such warrants directly to) Global's management, key advisors and directors.

Xethanol shall use reasonable efforts to include the shares underlying such warrants in any registration statement filed with the Securities and Exchange Commission, subject to (w) Global or the then holders of such warrants complying with such reasonable and customary requirements as Xethanol may request, including the providing of information and the entering into of customary indemnification agreements, (x) Global or the then holders of such warrants complying with such reasonable and customary requirements as any underwriter with respect to such registration may request, (y) cutbacks or limitations imposed by other holders of securities to be included in such registration statement and (z) or limitations imposed by any underwriter of the securities to be included in such registration statement.

4.2    Effective on and after the occurrence of a Change of Control Event with respect to Xethanol, Global shall have the option (the "Change of Control Right"), to require Xethanol to purchase the interest of Global in the Company in exchange for shares of the Common Stock of Xethanol. Global shall exercise its Change of Control Right, if at all, by giving Xethanol written notice of its election to do so within ten (10) days of the date the applicable Change of Control Event becomes effective. If Global shall exercise his Change of Control Right, Xethanol shall issue and deliver to Global as consideration for entire interest of Global in the Company, such number of shares of Xethanol Common Stock as Xethanol and Global may agree or, if no such agreement is reached within thirty (30) days of written notice from Global to Xethanol that it is exercising its Change of Control Right, such number of shares as is equal to (a) the value of Global's interest in the Company, as determined by an investment banker mutually agreeable to Global and Xethanol, divided by (b) the average closing price of Xethanol Common stock for the 15 days preceding the date on which the valuation of Global's interest in the Company is received from such investment banker, multiplied by (c) 0.95. For purposes of this Section 4.1, a Change of Control Event shall mean the approval by the stockholders of Xethanol, and the completion of the transaction resulting from such approval, of (A) the sale or other disposition of all or substantially all the assets of the Company or (B) a complete liquidation or dissolution of the Company; or the acquisition by any entity or individual of all or substantially all of the capital stock of the Company, other than in connection with a corporate reorganization of Xethanol.

4.3    Effective on and after the first anniversary of the date of this Agreement, Global shall have the option (the "Put Right"), to require Xethanol to purchase the interest of Global in the Company in exchange for shares of the Common Stock of Xethanol. Global shall exercise its Put Right, if at all, by giving Xethanol written notice of its election to do so. If Global shall exercise its Put Right, Xethanol shall issue and deliver to Global as consideration for entire interest of Global in the Company, such number of shares of Xethanol Common Stock as Xethanol and Global may agree or, if no such agreement is reached within thirty (30) days of written notice from Global to Xethanol that it is exercising its Change of Control Right, such number of shares as is equal to (a) the value of Global's interest in the Company, as determined by an investment banker mutually agreeable to Global and Xethanol, divided by (b) ninety per cent (90%) of the average closing price of Xethanol Common stock for the 15 days preceding the date on which the valuation of Global's interest in the Company is received from such investment banker.

5  Miscellaneous.

5.1    Services of Global. Global shall fulfill all of its obligations contained in this Agreement by providing the services of Tyrol to the extent necessary to fulfill such obligations, without cost or expense to the Company other than the compensation to be paid to Global as provided herein.

5.2    Confidentiality. All information received by any party with respect to the business and affairs of the Company or any Special LLC shall be considered confidential and shall not be utilized by any other party for its advantage or disclosed to others to the detriment of such party; provided, however, that this sentence is not intended to and shall not prevent any disclosure of information relating to the Company or any Special LLC to the professional advisors or agents of any party nor to prevent any disclosure to the extent required by law, provided that they are subject to obligations with respect to the confidentiality and use of such information that are the same as contained in this Section 5.1. Confidential information shall be deemed to include all information disclosed by Xethanol pursuant to the provisions of Section 2.8.

5.3    Expenses. Each party hereto shall pay his, her or its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated herein.

5.4    Notices. All notices, requests, demands or other communi-cations required or authorized or contemplated to be given under this Agreement shall be in writing and shall be deemed to have been duly given if hand delivered or sent by certified or registered mail, postage prepaid, and addressed to a party at its address as first set froth above, or at such other address as any party may from time to time furnish to the other party by a notice given in accordance with the provisions of this Section. All notices shall be deemed given (i) two business days after deposit into the U.S. Mail, or (ii) when personally delivered in the manner provided in this Section.

5.5    Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

5.6    Assignment. This Agreement may not be assigned by any party without the prior written consent of all of the parties hereto; provided that Associates may assign this Agreement to any entity which is controlled by or is under common control with it, without consent. Any attempt to assign this Agreement without the required consent shall be void. This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective heirs, successors and assigns.

5.7    Entire Agreement. This Agreement, together with the Exhibits hereto, contains the entire understanding between the parties hereto concerning the subject matter hereof and may not be changed, modified, altered or amended except by an agree-ment in writing executed by the parties hereto.

5.8    Amendments. Any change, modification, alteration or amendment shall be effective only in the specific instance for the specific purpose for which given. Any waiver by either party of any of its rights under this Agreement or of any breach of this Agreement shall not constitute a waiver of any other rights or of any other future breach.

5.9    Applicable Law. This Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of New York for contracts to be performed wholly within the State of New York, without reference to conflict of law principles.

5.10    Jurisdiction and Venue. In the event that any legal proceedings are commenced in any court with respect to any matter arising under this Agreement, the parties agree that:

5.10.1    The courts of the State of New York and/or the United States Federal Courts located in the State of New York shall have exclusive jurisdiction over each of the parties hereto and over the subject matter of any such proceedings; and

5.10.2    the venue of any such action shall be in New York County, New York and/or the United States District Court for the Southern District of New York.

5.11    Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the terms and conditions contained in this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

Xethanol Corporation                              Global Energy and Management, LLC


By:/s/ Christopher D'Arnaud-Taylor              By: /s/ Lee R. Tyrol
Christopher D'Arnaud-Taylor                      Lee R. Tyrol
CEO                                             President and CEO


-8-

Schedule A

<u>Services to be Provided by Global</u>

1.    The selection, employment, promotion, discharge and supervision of the executive staff and through the executive staff, the hiring, promotion, discharge, and work of all other operating and service employees performing services on behalf of each Special LLC and relating to each applicable Special LLC. All employees shall be on the payroll of the applicable Special LLC. The decision in regard to any change or replacement of employees shall be at the sole discretion of Global.

2.    The establishment of all prices and rate schedules for the products produced by the applicable Special LLC, and the negotiation and entering into of all contracts for the sale of its products by the applicable Special LLC.

3.    The negotiation and arranging of contract for the acquisition of feedstock, utilities and other goods and services required for the operation of the applicable Facility, and the monitoring, supervision of the performance of third parties under and enforcement of such agreements.

4.    Applying for, obtaining, and maintaining in the name of the applicable Special LLC all licenses and permits required of in connection with the operation of the applicable Facility. The applicable Special LLC shall execute and deliver any and all applications and other documents necessary therefor and to cooperate to the fullest extent possible with Global in the performance of these obligations.

5.    The submission to the Company for its approval of an annual budget of operations thirty (30) days before the commencement of each fiscal year. Global may deviate from such budget if in its reasonable judgment a deviation is necessary or desirable for the efficient operation of the Facility, subject to the approval of the Company, unless in the judgment of Global, the expense in question must be incurred as an emergency expense.

6.    The implementation and maintenance of suitable accounting and internal control systems.

7.    Performing all acts reasonably necessary in connection with the operation of the applicable Facility in an efficient and proper manner.

# ROBERT A. VORT, LLC

### www.vortlaw.com

**Robert A. Vort**
Certified Civil Trial Attorney

**Karin R. White Morgen**

2 University Plaza, Suite 200
Hackensack, New Jersey 07601
Telephone: 201-342-9501
Facsimile: 201-342-9504

---

April 22, 2008

Hon. Naomi R. Buchwald
United States District Court
    for the Southern District of New York
Room 2270
500 Pearl Street
New York, New York 10007-1312

Re: Global Energy & Management, LLC
    v. Xethanol Corp. et al
    07 Civ. 11049 NRB

Dear Judge Buchwald:

I reply to the April 21, 2008 letter of Paduano & Weintraub, LLP requesting permission to file a motion to dismiss pursuant to Fed.R.Civ.P. 8(a), 9(b) and 12(b)(6). As Ms. Harrison's letter addresses only the claimed insufficiency under Rule 9(b) and addresses neither Fed.R.Civ.P. 8(a) or 12(b)(6), I do the same.

Defendant first contend that any misstatements after June 23, 2006, the date on which plaintiff invested $250,000, cannot be the predicate for a claim of fraud because those statements occurred after the investment. This contention is correct but incomplete. After Global invested its $250,000, it incurred startup expenses including retention of consultants and lease of office space. I would enumerate these expenses more specifically but the mother of Lee Tyrol, the chief officer of Global, died on Sunday, April 20, 2008, and he is not available.

Those expenses and the lost profits that Global could have earned are compensable under New York law, <u>Kenford Co., Inc. v. County of Erie</u>, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986), <u>International Telepassport Corporation v. USFI, Inc.</u>, 89 F.3d 82, 85-86 (2d Cir. 1996), <u>Trademark Research Corp. v. Maxwell Online, Inc.</u>, 995 F.2d 326, 332 (2d Cir. 1993), and under Connecticut law, <u>Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin</u>, 247 Conn. 48, 63-65, 717 A.2d 724, 733-34 (1998), <u>Message Center Management, Inc. v. Shell Oil Products Co.</u>, 85 Conn.App. 401, 424, 857 A.2d 936, 951 (2004). Thus, even after Global invested its $250,000, it continued to

expend other money in reliance on defendants' statements and actions.

Xethanol acknowledges that the complaint pleads fraudulent statements made after June 23, 2006 by defendants Ames and Bernstein.  For the reasons stated in the preceding paragraph, those allegations retain their validity.

Xethanol complains that the second amended complaint makes no allegation of wrongdoing whatsoever against defendants Thomas Endres, John Murphy or David Kreitzer.  This is incorrect; paragraph 10 refers generally to all defendants and paragraph 11 refers specifically to all individual defendants.  Moreover, as directors of Xethanol, these defendants are personally liable for misstatements in documents filed with the Securities and Exchange Commission, 15 U.S.C. §§77l, 77o, 78j(b), 78l, 78m, 78t(a).  The limitation on controlling person liability, as held in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 169 L.Ed.2d 627, 128 S.Ct. 761 (2008), does not apply to this case.  The allegedly controlling persons joined in Stoneridge were vendors and customers of an allegedly fraudulent company.  Investors claimed that the vendors and customers had entered into sham transactions which allowed the defendant company to inflate his financial picture.  The case at bar involves officers and directors of Xethanol, not people unconnected to it.

Counsel correctly states that the complaint does not state the time and place of the representations which are the subject of paragraphs 10 and 11.  Although such allegations clearly satisfy the particularity requirement of Rule 9(b), they are not required, Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984) cited with approval by this Court in In re Initial Public Offering Securities Litigation, 241 F.Supp.2d 281, 327 n.47 (S.D.N.Y. 2003), Buckley v. Deloitte & Touche USA, LLP, 2007 WL 1491403 at *11 (S.D.N.Y. 2007).  In the former case, Judge Schiendlin stated in pertinent part:

> The application of Rule 9(b), however, must not abrogate the concept of notice pleading (quotation marks and citation omitted); Cayman Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357, 1362 (10th Cir. 1989) ("We recognize that the policy of simplicity in pleadings which underlies the Federal Rules of Civil Procedure requires a court to read Rule 9(b)'s requirements in harmony with Rule 8's call for a 'short and plain statement of the claim'") (citation omitted); Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 679 (6th Cir. 1988) ("In ruling upon a motion to dismiss under

Rule 9(b). . . .a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. . . .[T]he two rules must be read in harmony."); Friedlander v. Nims, 755 F.2d 810, 813 n.3 (11th Cir. 1985)("Rule 9(b) must not be read to abrogate rule 8, however, and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice plead- ing."); Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984) ("[F]ocusing exclusively on [Rule 9(b)'s] 'parti- cularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'")(ci- itations omitted).

The misrepresentations were made between January 2005 and November 2006.  The meetings occurred within that time frame. There were many meetings attended by many people, not several small meetings of a few people.  To require a date by date reca- pitulation is very difficult and perhaps impossible.  Such a re- quirement of time, date and place applied to a situation such as this case presents is a perversion of the federal rules and, in the words of Initial Public Offering, supra, "too narrow an ap- proach."  There is no basis for a claim that the action is barred by a statute of limitations and, given the narrow range of time involved and the specificity of paragraphs 11(a) through 11(l), we submit they are sufficient.

The use of the word "again" in paragraph 11(g) refers to de- fendants Taylor and Langberg.  The other defendants identified in that paragraph - including Bellone and Bullers - either made the statement or acquiesced in its accuracy by their silence.

Xethanol also claims that the complaint should have pleaded how Global calculates its damages.  Plaintiff disagrees.  Rule 9(b) does not require a calculation of plaintiff's damage calcu- lation, only of the "circumstances constituting fraud or malice," e.g., Shoppe v. Elizabeth Arden Sale Corp., 178 F.2d 150, 153 (2d Cir. 1949), Package Closure Corp. v. Sealright Co., 141 F.2d 972, 976 (2d Cir. 1944), PdP Parfums de Paris, S. A. v. International

Hon. Naomi R. Buchwald           4                    April 22, 2008


Designer Fragrances, Inc., 901 F.Supp. 581, 585 (E.D.N.Y. 1995).

Respectfully submitted,

Robert A. Vort

RAV:ft
by fax and by Federal Express
cc:  Paduano & Weintraub, LLC
     Global Energy and Management, LLC
     07-160

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES COURTHOUSE

500 PEARL STREET

NEW YORK, NY 10007-1312

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

212-805-0194

May 1, 2008

Robert A. Vort, Esq,
Robert A. Vort, LLC
2 University Place
Hackensack, NJ 07601

Katherine B. Harrison, Esq.
Paduano & Weintraub, LLP
1251 Avenue of the Americas, Ninth Floor
New York, NY 10020

BY MAIL AND FACSIMILE

Re:   **Global Energy and Management, LLC v. Xethanol
Corporation, et al.,  07 CV 11049 (NRB)**

Dear Counsel:

We have received defendants' letter dated April 21, 2008, requesting leave to file a
motion to dismiss the above-captioned case.  At this time, we wish to afford plaintiff a final
opportunity to amend his complaint within fourteen (14) days, if he believes he can do so
consistently with Fed. R. Civ. P. 11 and in a fashion that addresses the problems identified
by defendants.  We do so in the interest of avoiding an unnecessary round of motion practice.
Further, having been afforded the opportunity to amend its complaint in response to
defendants' submission, plaintiff should not anticipate being granted a further opportunity
to amend, should we find that there is merit in some or all of defendants' arguments.

If, after reviewing the third amended complaint or receiving notice that the plaintiff
will stand firm on its second amended complaint, the defendants still wish to make their
motion, the parties shall agree on a proposed briefing schedule, spanning no more than 60
days between the due dates for the defendants' opening and reply briefs, and submit a
proposed scheduling order by no later than May 23, 2008.

Very truly yours,

Naomi Reice Buchwald
United States District Judge

# ROBERT A. VORT, LLC

www.vortlaw.com

Robert A. Vort
Certified Civil Trial Attorney

Karin R. White Morgen

2 University Plaza, Suite 200
Hackensack, New Jersey 07601
Telephone: 201-342-9501
Facsimile: 201-342-9504

May 15, 2008

Clerk
United States District Court
  for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: Global Energy & Management, LLC
    v. Xethanol Corp. et al
    07 Civ. 11049 NRB

Dear Sirs:

I enclose an original and two copies of a third amended complaint and jury demand.  Please file the original and return "Filed" copies to me in the enclosed return envelope.

Respectfully submitted,

Robert A. Vort

RAV:bap
enclosures
by Federal Express
cc:  Hon. Naomi Reice Buchwald
     Paduano & Weintraub, LLP
     07-160

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL ENERGY AND MANAGEMENT, :
LLC, a limited liability com-
pany of Connecticut,                      :

               Plaintiff,       :        07 Civ. 11049 NRB

       -vs-                      :
                              THIRD AMENDED COMPLAINT and
XETHANOL CORPORATION, CHRISTO-:  DEMAND FOR JURY TRIAL
PHER D'ARNAUD-TAYLOR, JEFFERY
LANGBERG, LAWRENCE S. BELLONE,:
LOUIS B. BERNSTEIN, DAVID AMES,
and ROBIN BULLER,                      :

              Defendants. :
_____x

     Global Energy and Management, LLC, a limited liability com-
pany of Connecticut ("plaintiff" or "Global Energy"), with its
principal place of business at 130 Captains Drive, Westbrook,
Connecticut, complains as follows:

### JURISDICTIONAL STATEMENT

     1.   Global Energy is a limited liability company of Connec-
ticut whose principal place of business is located in Connecti-
cut.

     2.   All members of Global Energy are citizens of Connecti-
cut.

     3.   Xethanol Corporation is a Delaware corporation whose
principal place of business is in New York.

     4.   Upon information and belief, none of the individual de-
fendants is a Connecticut citizen.

5. The amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Upon information and belief, defendant Christopher D'Arnaud-Taylor was an officer of Xethanol at all times relevant to this action.

7. Upon information and belief, defendant Jeffery Langberg was a director of Xethanol at certain times relevant to this action and an advisor to the board of directors at other times relevant to this action.

8. Upon information and belief, defendant Lawrence S. Bellone was a director and the chief financial officer of Xethanol at all times relevant to this action.

9. Upon information and belief, defendants Louis Bernstein, David Ames, Thomas J. Endres, Robert Buller, David Kreitzer and John Murphy were either directors, officers or employees of Xethanol at all times relevant to this action.

10. As set forth in this paragraph, the individual defendants represented to Lee Tyrol and other representatives of Global orally on many telephone calls and in innumerable meetings that Xethanol could manufacture cellulosic ethanol (ethanol made from garbage and wood as opposed to ethanol made from corn or sugar) in a commercially profitable manner. Defendants misrepresented the state of Xethanol's business operations and the state of the technology it possessed. They stated that Xethanol owned

2

patents and other technology from which it could manufacture eth-

anol from bio-mass in a profitable manner. They also stated that

they were currently producing 6,000,000 gallons of ethanol a

year. More particularly:

a. In a brochure published in January 2005 entitled "Xe-

thanol: Biomass to Biofuels" that Xethanol was producing

6,000,000 gallons of ethanol a year.

b. In a press release dated August 26, 2005, Xethanol re-

ported that it had acquired the stock of Xylose Technologies,

Inc.. The release quoted Christopher d'Arnaud Taylor as saying:

"This is far more than a purchase of a milestone technology for

lowering the cost of making ethanol from biomass. Rather, it is

the pooling of Xethanol management with a world class scientific

team headed by Dr. Jeffries that will continue to develop ways to

make xylitol and ethanol more efficiently from biomass. This al-

liance with Dr. Jeffries and his team at the USDA Forest Products

Lab will enable Xethanol to accelerate development and deployment

of its biomass technologies."

c. In a press release dated September 16, 2005, Xethanol

stated: "Xethanol Corporation seeks to become a leader in the

emerging biomass-to-ethanol industry. Its mission is to convert

biomass that is currently being abandoned or land filled into

ethanol and other valuable co-products, such as xylitol. Xetha-

nol's strategy is to deploy proprietary bio-technologies that

3

will extract and ferment the sugars trapped in these biomass waste concentrations.  Xethanol's goal is to produce ethanol and valuable co-products more cost effectively than corn-based pro-cessors with Xethanol plants located closer to biomass sources. In Iowa, Xethanol owns and operates two ethanol production faci-lities, where it is deploying these technologies."

  d. On or about February 21, 2006 at the Xethanol office in New York, Christopher D'Arnaud Taylor and Jeffrey Langberg told Lee Tyrol, William DiBella and Eric Bartone that Xethanol pos-sessed the technology for the cellulosic production of ethanol on a commercially profitable basis.  Taylor said that he could "make a plant" producing cellulosic ethanol that would make money and be profitable in Tyrol's front yard.  Langberg produced a Tupper-ware container about two feet long, one foot wide and two feet deep which supposedly contained a sugar which was the byproduct of the cellulosic production of ethanol.  Taylor demonstrated with markers on a whiteboard how one could put garbage into a plant and produce ethanol.  Over the hand-drawn flow chart, Tay-lor wrote "Garbage In, Ethanol Out."  Taylor and Langberg told the Global representatives that Xethanol was already converting garbage into ethanol at its Iowa plant and selling the product. After this meeting, Tyrol and William DiBella met with Joseph J. Grano, Jr., chairman and chief executive officer of Centurion Holdings, LLC, an advisor to the board of directors of Xethanol.

4

Grano stated that "these boys seem to have finally got it right," and he confirmed that Xethanol had the technology to convert garbage into ethanol in a commercially profitable manner.

e.    In a Form 10KSB filed with the Securities and Exchange Commission on or about March 31, 2006, Xenathol described its plan of operation as follows: "Our expected revenue model is based on the sale of ethanol and a related co-product called xylitol.  Xylitol is a natural sweetener that was approved by the FDA in the 1980's for use in foods and beverages, including chewing gums, candles, toothpastes and diabetic regimens.  Xylitol is a co-product derived from biomass-to-ethanol production.  At the present time, we own two ethanol plants in Iowa - Xethanol Bio-Fuels in Blairstwon and Permeate Refining in Hopkinton.  We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol."

f.    Defendants allowed Xethanol to be featured in the February 2006 issue of Fortune Small Business.  D'Arnaud-Taylor represented that Xethanol had the technology to convert garbage into ethanol, stating "Xethanol isn't just relying on candy for its fuel supply.  This year it plans to introduce a process that will make it possible to turn all kinds of things - including cornstalks, grass clippings, and old newspapers - into ethanol. . .

5

Xethanol will use a recently discovered form of yeast to ferment various types of garbage into ethanol. It has obtained rights to the process from the U. S. Department of Agriculture, where a scientist discovered that yeast in the intestines of a type of beetle can convert plant-based waste product into ethanol. This year d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge left over from paper milling. The plants will be able to make in total more than 100 million gallons a year."

g.    On or about May 18, 2006 at a meeting at the Xethanol office in New York attended by Christopher D'Arnaud Taylor, Jeffrey Langberg, Lawrence Bellone and Robin Bullers on behalf of Xethanol and by Lee Tyrol, Mark DiBella and Eric Bartone on behalf of plaintiff, Taylor drew another flow chart on a white board demonstrating that garbage could be placed within machinery which would ethanol. Langberg stated to Tyrol, DiBella and Bartone that this technology would "make a fortune" for Global and for Xethanol. Bellone and Bullers participated in the conversations, contradicted nothing said by Taylor and by Langberg and independently confirmed their beliefs that this process of converting garbage to ethanol was feasible and would be very profitable.

h.    On or about June 8, 2006 at the Xethanol office in New York, in the presence of Lee Tyrol, Erik Bartone and Mark DiBella, D'Arnaud Taylor, Langberg, Bellone and Bullers again stated that Xethanol had the technology with which to engage in the cel-

6

lulosic production of ethanol on a commercially profitable basis.

11.   The representations made by defendants to Tyrol and the other Global representatives were false and known by defendants to be false when they were made.

12.   Defendants made their representations in order to induce plaintiff to rely on them.

13.   Global relied on the representations of defendants to its detriment and, in reliance on their representations, invested $250,000 into New England Xethanol, a limited liability company formed by Global and by Xethanol to engage in the biomass to biofuels business.

Wherefore, Global demands judgment a) compelling defendants to repay Global's $250,000 investment, b) Global's lost profits from New England Xethanol in such amount as the evidence shall prove, b) consequential damages, c) pre-judgment interest, d) costs of suit and e) such other relief as the Court may hold just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

ROBERT A. VORT, LLC

Dated: May 15, 2008

Robert A. Vort
Attorney for Plaintiff
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
201-342-9504 fax
rvort@vortlaw.com

8

# ROBERT A. VORT, LLC

www.vortlaw.com

Robert A. Vort
Certified Civil Trial Attorney

Karin R. White Morgen

2 University Plaza, Suite 200
Hackensack, New Jersey 07601
Telephone: 201-342-9501
Facsimile: 201-342-9504

May 15, 2008

Clerk
United States District Court
   for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

                    Re: Global Energy & Management, LLC
                         v. Xethanol Corp. et al
                         07 Civ. 11049 NRB

Dear Sirs:

     I enclose an original and two copies of a third amended com-

plaint and jury demand.  Please file the original and return

"Filed" copies to me in the enclosed return envelope.

                              Respectfully submitted,

                              Robert A. Vort

RAV:bap
enclosures
by Federal Express
cc:  Hon. Naomi Reice Buchwald
     Paduano & Weintraub, LLP
     07-160

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

May 23, 2008

Via Email and Fax

Robert A. Vort, Esq.
2 University Plaza, Suite 200
Hackensack, New Jersey 07601

Re: Global Energy and Management, LLC v. Xethanol Corporation,
Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone,
Louis B. Bernstein, David Ames and Robin Buller, 07-CV-11049 (NRB) (SNDY)

Dear Robert:

As we discussed on the phone, we have seen no substantiation at all for Global's allegation in the Third Amended Complaint that it invested $250,000 in New England Xethanol; we believe this allegation to be false.

In addition, though you changed the caption to remove the names of Thomas J. Endres, David Kreitzer and John Murphy, paragraph 9 still refers to those individuals as "defendants." You told me on the phone that it was your intention to drop them as defendants in the action. Similarly, as you have now dropped all allegations of wrongdoing after June 2006, and have alleged no wrongdoing whatsoever by David Ames or Louis Bernstein, those defendants should be dropped as well.

It is unclear whether Global attempts to plead a fraud claim or a contract claim but we do not think Global has stated a valid claim under either theory, for the reasons we have discussed in our prior correspondence with you concerning earlier versions of the complaint.

Therefore, there would appear to be several Rule 11 problems with the Third Amended Complaint. Accordingly, we urge you to withdraw this pleading. Pursuant to Rule 11, we intend to serve a Motion under that Rule on you if you do not withdraw the Third Amended Complaint.

Very truly yours,

Katherine B. Harrison

ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:07-cv-11049-NRB

Global Energy and Management, LLC v. Xethanol
Corporation et al
Assigned to: Judge Naomi Reice Buchwald
Demand: $9,999,000
Cause: 28:1332 Diversity-Fraud

Date Filed: 12/06/2007
Jury Demand: Plaintiff
Nature of Suit: 370 Fraud or Truth-In-
Lending
Jurisdiction: Diversity

**Plaintiff**

**Global Energy and Management,
LLC**
*a limited liability company of
Connecticut*

represented by **Robert A. Vort**
Robert A. Vort, LLC
2 University Plaza
Hackensack, NJ 07601
(201)-342-9501
Fax: (201)-342-9504
Email: rvort@vortlaw.com
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Xethanol Corporation**

**Defendant**

**Christopher D'Arnaud-Taylor**

**Defendant**

**Jeffrey Langberg**

**Defendant**

**Lawrence S. Bellone**

**Defendant**

**Louis B. Bernstein**

**Defendant**

**David Ames**

**Defendant**

**Thomas J. Endres**

**Defendant**

**Robin Buller**

**Defendant**

**David Kreitzer**

**Defendant**

**John Murphy**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/06/2007 | 1 | COMPLAINT against David Kreitzer, John Murphy, Xethanol Corporation, Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein, David Ames, Thomas J. Endres, Robin Buller. (Filing Fee $ 350.00, Receipt Number 635142)Document filed by Global Energy and Management, LLC.(mbe) (jeh). (Entered: 12/10/2007) |
| 12/06/2007 | | SUMMONS ISSUED as to David Kreitzer, John Murphy, Xethanol Corporation, Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein, David Ames, Thomas J. Endres, Robin Buller. (mbe) (Entered: 12/10/2007) |
| 12/06/2007 | | CASE REFERRED TO Judge Harold Baer Jr. as possibly related to 1:06-cv-10234. (mbe) (Entered: 12/10/2007) |
| 12/06/2007 | | Case Designated ECF. (mbe) (Entered: 12/10/2007) |
| 12/06/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Global Energy and Management, LLC.(mbe) (jeh). (Entered: 12/10/2007) |
| 12/17/2007 | | CASE DECLINED AS NOT RELATED. Case referred as related to 06cv10234 and declined by Judge Harold Baer and returned to wheel for assignment. (jeh) (Entered: 01/02/2008) |
| 12/17/2007 | | Magistrate Judge Frank Maas is so designated. (jeh) (Entered: 01/02/2008) |
| 01/02/2008 | 3 | NOTICE OF CASE ASSIGNMENT to Judge Naomi Reice Buchwald. Judge Unassigned is no longer assigned to the case. (jeh) (Entered: 01/02/2008) |
| 01/07/2008 | 4 | AMENDED COMPLAINT amending 1 Complaint against David Kreitzer, John Murphy, Xethanol Corporation, Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein, David Ames, Thomas J. Endres, Robin Buller.Document filed by Global Energy and Management, LLC. Related document: 1 Complaint filed by Global Energy and Management, LLC.(db) (db). (Entered: 01/14/2008) |
| 01/09/2008 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Robert A. Vort for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1(d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for |

| | | |
|---|---|---|
| | | Document 4 Amended Complaint to: case_openings@nysd.uscourts.gov. (db) (Entered: 01/14/2008) |
| 02/12/2008 | 5 | MOTION to Amend/Correct *complaint*. Document filed by Global Energy and Management, LLC. Return Date set for 2/20/2008 at 10:00 AM. (Attachments: # 1 Affidavit in sup of motion to amend complaint, # 2 brief in support of motion)(Vort, Robert) (Entered: 02/12/2008) |
| 03/19/2008 | 6 | MEMO ENDORSEMENT granting 5 Motion to Amend/Correct. Global Energy and Management, LLC, a limited liability company of Connecticut, hereby moves for leave to file a second amended complaint. This application is based on the affidavit of Robert A. Vort. Notice has not been given to defendants because none of them has been served with a summons or either prior complaint. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 3/19/2008) (jmi) (Entered: 03/19/2008) |
| 03/19/2008 | 7 | SECOND AMENDED COMPLAINT amending 4 Amended Complaint, against David Kreitzer, John Murphy, Xethanol Corporation, Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein, David Ames, Thomas J. Endres, Robin Buller.Document filed by Global Energy and Management, LLC. Related document: 4 Amended Complaint, filed by Global Energy and Management, LLC.(dle) (dle). (Entered: 03/20/2008) |
| 03/19/2008 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Robert A. Vort for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1(d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 7 Amended Complaint, to: case_openings@nysd.uscourts.gov. (dle) (Entered: 03/20/2008) |
| 03/25/2008 | 8 | CERTIFICATE OF SERVICE. Xethanol Corporation served on 3/20/2008, answer due 4/9/2008. Service was accepted by Denique Blackman, title unknown. Document filed by Global Energy and Management, LLC. (Vort, Robert) (Entered: 03/25/2008) |
| 04/04/2008 | 9 | STIPULATION AND ORDER, that the time for defendant Xethanol Corporation to answer the Second Amended Complaint has been extended from 4/9/08 to and including 4/23/08. Xethanol Corporation answer due 4/23/2008. (Signed by Judge Naomi Reice Buchwald on 4/4/07) (cd) (Entered: 04/04/2008) |
| 05/16/2008 | 10 | THIRD AMENDED COMPLAINT amending 7 Amended Complaint, against Xethanol Corporation, Christopher D'Arnaud-Taylor, Jeffrey Langberg, Lawrence S. Bellone, Louis B. Bernstein, David Ames, Robin Buller.Document filed by Global Energy and Management, LLC. Related document: 7 Amended Complaint, filed by Global Energy and Management, LLC.(dle) (dle). (Entered: 05/19/2008) |
| 05/27/2008 | 11 | STIPULATION AND ORDER, It is hereby stipulated and agreed by and between the undersigned counsel that the motion of Defendant Xethanol Corporation to dismiss the Third Amended Complaint will be briefed, filed and served on the following schedule: Defendant's motion: on or before June 26, |

2008; Plaintiff's Opposition: on or before July 17, 2008; Defendant's Reply: on or before July 31, 2008. (Signed by Judge Naomi Reice Buchwald on 5/23/08) (mme) (Entered: 05/27/2008)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 06/17/2008 14:44:07 | | | |
| PACER Login: | pw0367 | Client Code: | 11023 |
| Description: | Docket Report | Search Criteria: | 1:07-cv-11049-NRB |
| Billable Pages: | 2 | Cost: | 0.16 |

**XETHANOL CORP  Form 8-K**                                              **June 29, 2006**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**
**FORM 8-K**
**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): June 23, 2006

**Xethanol Corporation**

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**

(State or Other Jurisdiction of Incorporation)

| **000-50154** | **84-1169517** |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

| **1185 Avenue of the Americas** | |
| **New York, New York** | **10036** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(646) 723-4000**

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SECTION 1 REGISTRANT'S BUSINESS AND OPERATIONS**

**ITEM 1.01. Entry into a Material Definitive Agreement.**

On June 23, 2006, Xethanol Corporation ("Xethanol") entered into an Organizational Agreement (the "Organizational Agreement") with Global Energy and Management LLC, a Connecticut limited liability company ("Global"), pursuant to which they organized a Delaware limited liability company known as NewEnglandXethanol, LLC ("NewEnglandXethanol"). On the same date, Xethanol and Global entered into an Operating Agreement (the "Operating Agreement") that relates to the operation and management of NewEnglandXethanol. Xethanol and Global organized NewEnglandXethanol to develop and operate facilities for the production of ethanol in the States of Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont and Maine. Xethanol has granted NewEnglandXethanol and each Special LLC (as defined below) the non-exclusive right to use all Xethanol technology that may be useful for the development and operation of such facilities in the geographic areas in which NewEnglandXethanol intends to construct its facilities. Xethanol and Global each own a 50% membership interest in NewEnglandXethanol. NewEnglandXethanol will be managed by a Board of Managers, which will initially consist of four members. Xethanol and Global will each have the right to designate two of the members of the board.

Significant provisions in the Organizational Agreement include:

**Special Purpose Limited Liability Companies.** Each of NewEnglandXethanol's facilities will be constructed and operated by a special purpose limited liability company (a "Special LLC"). The manager of each Special LLC will be Lee A. Tyrol (a member of Global) or, if Mr. Tyrol is unable to serve, Global or its designee. Xethanol and Global will provide each Special LLC with certain services that are set forth in the Organizational Agreement in consideration of which each Special LLC will pay management fees to Xethanol and Global, also as set forth in the Organizational Agreement. Each Special LLC will also pay Xethanol a technology access fee as set forth in the Operating Agreement in consideration of Xethanol's license of its technologies to the Special LLC.

**Capitalization.** Global has agreed to contribute an aggregate of $1,500,000 to the capital of NewEnglandXethanol in three installments. The initial installment of $250,000 was paid upon the execution of the Organizational and Operating Agreements; the second installment of $250,000 is payable within 90 days thereafter; and the final installment of $1,000,000 is payable upon approval by Xethanol and Global of the construction of the first facility to be developed by NewEnglandXethanol.

**Warrants to Purchase Xethanol Common Stock.** Xethanol has issued to Global a warrant to purchase 20,000 shares of Xethanol's common stock, par value $.001 per share ("Common Stock"), at a purchase price of $6.85 per share that is first exercisable on June 23, 2007 (subject to a right of immediate exercise upon a Change of Control Event (as defined in the Organizational Agreement)) and is exercisable until June 23, 2010. Xethanol has granted Global certain registration rights with respect to the shares underlying the warrant.

**Exchange of Global Interests.** Upon a Change of Control Event, Global will have the right to exchange its interest in NewEnglandXethanol for shares of Common Stock, at an exchange rate to be agreed upon by Xethanol and Global or, if they cannot agree, at a rate based upon the appraised value of Global's interest in NewEnglandXethanol and 95% of the market price of the Common Stock for the 15 days preceding the completion of the valuation of Global's interest in NewEnglandXethanol.

Xethanol has agreed to permit Global to require Xethanol to exchange Global's interest in NewEnglandXethanol for shares of Common Stock at any time beginning June 23, 2007. The interests will be exchanged at a rate to be agreed upon by Xethanol and Global or, if they cannot agree, at a rate based upon the appraised value of Global's interest in NewEnglandXethanol and 90% of the market price of the Common Stock for the 15 days preceding the completion of the

valuation of Global's interest in NewEnglandXethanol.

2

Reference is made to Exhibits 1.1 and 1.2 to this Current Report on Form 8-K for the complete terms of the Organizational Agreement and the Operating Agreement. A press release announcing the organization of NewEnglandXethanol was issued by Xethanol on June 27, 2006 and is attached hereto as Exhibit 99.1.

## SECTION 3 - SECURITES AND TRADING MARKETS

### ITEM 3.02. Unregistered Sales of Equity Securities

On June 23, 2006, Xethanol issued to Global a warrant (the "Warrant") to purchase 20,000 shares of Common Stock at an exercise price of $6.85 per share. The Warrant is first exercisable on June 23, 2007 (subject to a right of immediate exercise upon a Change of Control Event) and is exercisable until June 23, 2010. The Warrant was issued in connection with and pursuant to the Organizational Agreement without consideration for the Warrant other than the obligations of Global under the Organizational Agreement. Xethanol did not receive any cash in connection with the issuance of the Warrant. No commissions were paid or payable with respect to the issuance of the Warrant.

Exemption from registration of the Warrant specified in the preceding subparagraph (a) is claimed under Section 4(2) of the Securities Act of 1933, as amended (the "Act") because the transaction did not involve a public offering and was therefore exempt from the registration requirements of Section 5 of the Act.

The Warrant is attached to this Current Report on Form 8-K as Exhibit 3.1.

3

**SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS**

**ITEM 9.01. Exhibits**

Following is the Index of Exhibits furnished in accordance with Item 601 of Regulation S-K, filed as part of this Current Report on Form 8-K or incorporated by reference herewith:

1.1    Organizational Agreement, dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy and Management LLC.

1.2    Operating Agreement dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy and Management LLC.

3.1    Warrant dated as of June 23, 2006, issued by Xethanol Corporation to Global Energy and Management LLC.

99.1    Press release issued by Xethanol Corporation on June 27, 2006.

4

## SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Xethanol Corporation

Date: June 27, 2006                          By:  /s/ Lawrence S. Bellone

Lawrence S. Bellone
Chief Financial Officer

5

EX-1.1 2 v046318_ex1-1.htm

**Exhibit 1.1**

**Organizational Agreement, dated as of June 23, 2006, by and between Xethanol Corporation and Global Energy Management LLC.**

## ORGANIZATIONAL AGREEMENT

This Organizational Agreement is made as of the 23rd day of June, 2006 by and among Xethanol Corporation, a Delaware corporation with an address at 1185 Avenue of the Americas, 20th Floor, New York, NY 10036 ("Xethanol"), Global Energy and Management, LLC, a Connecticut limited liability company with an address at 130 Captains Drive, Westbrook, CT 06498 ("Global") and NewEnglandXethanol, LLC, a Delaware limited liability company with an address at 130 Captains Drive, Westbrook, CT 06498 (the "Company").

### RECITALS:

I. Xethanol and Global (each, a "Member" and, together, the "Members") have formed the Company for the purpose of initiating, developing, investing in and managing projects for the production of ethanol in the States of Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont and Maine (the "Territory"); (ii) engaging in any or all general business activities that may be related or incidental to, or may appear conducive or expedient for the accomplishment of, the foregoing ; and (iii) engaging in any business or activity that might be engaged in or carried on by a limited liability company formed under the Act. Each Member will have an interest in the Company as set forth in this Agreement.

II. The Members have agreed upon the method by which they will manage the ethanol projects to be engaged in by the Company and upon certain financial obligations that they will have to each other and the Company. They wish to set forth their understandings and agreement in this Agreement.

NOW, THEREFORE, in order to evidence their mutual agreements and understandings concerning the subject matter hereof, the parties hereto agree as follows:

1. Organization of the Company.

1.1   Organization and Initial Ownership Interests. On the date hereof, the parties will execute the NewEnglandXethanol Operating Agreement (the "Operating Agreement") that is attached to this Agreement as Exhibit A and will take or cause to be taken all such further action as may be necessary or proper to effect the existence of the Company under the laws of the State of Delaware. Pursuant to the Operating Agreement, Xethanol will own 5 Units of Interest as a Class A Member in the Company and Global will own 5 Units of Interest as a Class B Member in the Company. In consideration for such Interests,

1.1.1   Global will contribute the sum of $1,500,000 to the capital of the Company. Such sum will be payable in three installments. The first installment of $250,000 will be payable concurrently with the execution of this Agreement and the Operating Agreement (the "Effective Date"). The second installment of $250,000 will be payable ninety (90) days from the Effective Date. The third installment of $1,000,000 will be payable upon on the date on which the construction of the first Facility (as hereinafter defined) is approved by the Members.

1.1.2    Xethanol will grant the Company and each Special LLC (as hereinafter defined) a non-exclusive license to use (without the right to sublicense) in the Territory all of its intellectual property that is useful in developing or operating Facilities including, but not limited to, patents and know-how relating to ethanol production and the engineering of biorefineries for ethanol production, feedstock analysis and procurement, plant location, strategic alliances, customers, corporate branding, plant management, recruitment and training. Xethanol will provide such information to the Company and to each Special LLC upon request, and will furnish them with reasonable assistance to use such information for the purposes of development and operation of the Facility being developed by the relevant Special LLC. All of such information shall be deemed to be, and shall be treated by Global, the Company and each Special LLC as, Confidential Information in accordance with the provisions of Section 5.1 of this Agreement.

2. Project Management. The Company, with the assistance of Global and Xethanol, will be responsible for site selection and acquisition, the development of facilities for the production of ethanol and the management of those facilities, in accordance with the following:

2.1    The facilities which the Company will develop pursuant to this agreement will be biorefineries for the production of ethanol, each having an annual production capacity of 40,000,000 barrels of ethanol per year (each, a "Facility").

2.2    The Company and Global will identify sites within the Territory for the proposed location of Facilities. Upon identification of each site, the Company will so notify the Members and, upon approval of such site by the Members, the Company and Global will commence negotiation for the acquisition or lease of such site.

2.3    Upon identification of a site for a Facility, the Company and Global shall cause a Bankable Feasibility Study with respect to such facility and its operation, to determine whether or not such Facility can support a stand-alone capital structure (each, a "Study"). Among other things, each Study will set forth the risks and returns applicable to each Facility, the terms and conditions for the financing of such facility and a preliminary analysis of available feedstock, pricing and quantity. The Study will include financial modeling illustrating total required capital investment for the Facility and proposed financing terms, operating cash flow scenarios, debt servicing (with coverages) and returns on membership interests.

2.4    If the Company and Global are successful in procuring a site, the Study applicable to such site is acceptable to both Global and Xethanol and the Company has been able to procure financing for the construction and operation of the applicable Facility that is acceptable to both Global and Xethanol, then the Company will form a single-purpose limited liability company (a "Special LLC"), of which the Company will be the sole Member, which will (a) acquire or lease that site, (b) conduct such environmental and other tests as are required, (c) engage engineers, architects and other professional advisors as may be necessary for the development of a Facility on such site, (d) enter into contracts for the construction of, and effect the construction of, such Facility and (e) operate such Facility, directly or under contract with third parties.

2.5    The Company will, and Global and Xethanol will assist the Company to, raise investment capital from third parties for purposes of funding the development and operation of each Facility. Xethanol will have the right, but not the obligation, to invest in any or all of such Special LLCs, on the same terms as are offered to third party investors. Such investment may be made, at the option of Xethanol, in either the applicable Special LLC or the Company, in which latter event the percentage interest to be obtained by Xethanol in the Company shall be agreed upon by Global and Xethanol or, in the absence of such agreement, determined by arbitration held before a single arbitrator sitting in New York, NY, and appointed and acting in accordance with the commercial arbitration rules of the American Arbitration Association then in effect.

2.6    Subject to obtaining necessary approvals from Xethanol as the Class A Member of the Company, Global shall cause the commencement of construction (or, in the case of conversion of an existing facility to become a Facility, the commencement of such conversion) of at least one (1) Facility during 2006 and shall cause the commencement of construction (or, in the case of conversion of an existing facility to become a Facility, the commencement of such conversion) of at least one (1) additional Facility during 2007.

2.7    Lee A. Tyrol, a Member of Global ("Tyrol"), or, if Tyrol is unable to serve, Global or another person designated by Global and reasonably acceptable to Xethanol, will be the Manager of each Special LLC; provided, however, that such Manager, will not have the right without the consent of the Members to:

2.7.1    lease, license or purchase any material assets;

2.7.2    sell, lease, license or make any other disposition of any material assets of the Special LLC, other than in the ordinary course of its business;

2.7.3    borrow money which is not for use in the ordinary course of business of the Special LLC;

2.7.4    make any loan on behalf of the Special LLC, or advance credit on behalf of the Special LLC (other than in the ordinary course of its business), or authorize the guarantee by the Special LLC of any obligation of any third party; or

2.7.5    issue any additional Membership Interests in the Special LLC, or the right or option to acquire any such interests, or any security convertible into such interests, other than (a) to employees, consultants and others providing services to the Special LLC, pursuant to plans or other arrangements approved by the Member.

2.7.6    Confess a judgment against the Special LLC, or the consent to the entry of any such judgment;

-3-

2.7.7   on behalf of the Special LLC, enter into any transaction or agreement of any nature, or modifying any agreement, with any person or firm which is an Affiliate of Global

2.8   Global will provide the Company and each Special LLC with the services set forth on Schedule A to this Agreement.

2.9   The Company will compensate Global and Xethanol for the services rendered pursuant to this Section 2 (other than, in the case of Xethanol, Sections 2.6 and 2.7) by payment to them of the amounts set forth in Sections 3.2 and 3.2, respectively. The Company will provide Global with such office space and secretarial and administrative assistance as he shall reasonably require in rendering his services as required hereunder.

3   <u>Financial Obligations</u>.

3.1   In consideration of the services to be rendered by Global as provided in Section 2.4., the Company will cause each Special LLC to pay Global a management fee as follows:

3.1.1   Commencing on the date that such Special LLC acquires title or enters into a long-tem lease to the property on which a Facility is to be built and ending on the earlier of (a) the date on which the applicable Facility first produces ethanol in commercial quantities or (b) the Company elects to discontinue development of that Facility, a monthly fee of $15,000 per month, which fee shall be payable on the tenth day of each month during the period.

3.1.2   Commencing on the date that such Special LLC first produces ethanol in commercial quantities and thereafter until the first calendar month in which the operating cash flow of such Special LLC is positive, a monthly fee of $15,000 per month, which fee shall be payable on the tenth day of each month during the period.

3.1.3   Commencing with the first month following the first calendar month in which the operating cash flow of such Special LLC is positive, a monthly fee equal to the greater of (s) $15,000 or (b) the sum of (x) 3% of the gross revenues of the applicable Facility and (y) the net income (determined in accordance with generally accepted accounting principles consistently applied) of such Special LLC with respect to such month, which fee shall be payable on the tenth day of each month during the period.

3.2   In consideration of the services to be rendered by Global in accordance with Section 2.1, commencing on the Effective Date, the Company will pay Global the sum of $15,000 per month, plus expenses reasonably incurred by Global in rendering such services.

3.3   In consideration of the services to be rendered by Xethanol in accordance with Sections 2.1 through 2.5, inclusive, commencing on the date on which each Project is approved by the Company and ending on the date on which the Plant constructed as part of such Project first produces ethanol for commercial sale, the Company will pay Xethanol the sum of $10,000 per month with respect to each such Project.

-4-

3.3.1    In consideration of the license granted by Xethanol in Section 2.5, the Company and each Special LLC shall, jointly and severally, pay Xethanol the amounts set forth Section 5.2.4 of the Operating Agreement.

4  Equity Interests.

4.1    Concurrently with the execution of this Agreement, Xethanol shall issue Global warrants to purchase 20,000 shares of Xethanol's Common Stock, par value $.001 per share. Such warrants shall be identical in form to the Class B Warrants issued to certain investors and attached as an exhibit of Xethanol's form 8-K filed with the Securities and Exchange Commission on April 7, 2006, except that:

4.1.1  Such warrants shall have an exercise price of $6.85 per share;

4.1.2  Such warrants shall be exercisable for a 3-year term commencing on the first anniversary of the date of this Agreement; provided, however, that such warrants shall become exercisable immediately upon the occurrence of a Change of Control Event, as defined in Section 4.2.

Subject to (a) compliance with applicable securities laws and regulations and (b) the consent of Xethanol, which consent shall not e unreasonably withheld, Global may distribute (or direct that Xethanol issue such warrants directly to) Global's management, key advisors and directors.

Xethanol shall use reasonable efforts to include the shares underlying such warrants in any registration statement filed with the Securities and Exchange Commission, subject to (w) Global or the then holders of such warrants complying with such reasonable and customary requirements as Xethanol may request, including the providing of information and the entering into of customary indemnification agreements, (x) Global or the then holders of such warrants complying with such reasonable and customary requirements as any underwriter with respect to such registration may request, (y) cutbacks or limitations imposed by other holders of securities to be included in such registration statement and (z) limitations imposed by any underwriter of the securities to be included in such registration statement.

4.2    Effective on and after the occurrence of a Change of Control Event with respect to Xethanol, Global shall have the option (the "Change of Control Right"), to require Xethanol to purchase the interest of Global in the Company in exchange for shares of the Common Stock of Xethanol. Global shall exercise its Change of Control Right, if at all, by giving Xethanol written notice of its election to do so within ten (10) days of the date the applicable Change of Control Event becomes effective. If Global shall exercise his Change of Control Right, Xethanol shall issue and deliver to Global as consideration for entire interest of Global in the Company, such number of shares of Xethanol Common Stock as Xethanol and Global may agree or, if no such agreement is reached within thirty (30) days of written notice from Global to Xethanol that it is exercising its Change of Control Right, such number of shares as is equal to (a) the value of Global's interest in the Company, as determined by an investment banker mutually agreeable to Global and Xethanol, divided by (b) the average closing price of Xethanol Common stock for the 15 days preceding the date on which the valuation of Global's interest in the Company is received from such investment banker, multiplied by (c) 0.95. For purposes of this Section 4.1, a Change of Control Event shall mean the approval by the stockholders of Xethanol, and the completion of the transaction resulting from such approval, of (A) the sale or other disposition of all or substantially all the assets of the Company or (B) a complete liquidation or dissolution of the Company; or the acquisition by any entity or individual of all or substantially all of the capital stock of the Company, other than in connection with a corporate reorganization of Xethanol.

4.3    Effective on and after the first anniversary of the date of this Agreement, Global shall have the option (the "Put Right"), to require Xethanol to purchase the interest of Global in the Company in exchange for shares of the Common Stock of Xethanol. Global shall exercise its Put Right, if at all, by giving Xethanol written notice of its election to do so. If Global shall exercise its Put Right, Xethanol shall issue and deliver to Global as consideration for entire interest of Global in the Company, such number of shares of Xethanol Common Stock as Xethanol and Global may agree or, if no such agreement is reached within thirty (30) days of written notice from Global to Xethanol that it is exercising its Change of Control Right, such number of shares as is equal to (a) the value of Global's interest in the Company, as determined by an investment banker mutually agreeable to Global and Xethanol, divided by (b) ninety per cent (90%) of the average closing price of Xethanol Common stock for the 15 days preceding the date on which the valuation of Global's interest in the Company is received from such investment banker.

5  Miscellaneous.

5.1    Services of Global. Global shall fulfill all of its obligations contained in this Agreement by providing the services of Tyrol to the extent necessary to fulfill such obligations, without cost or expense to the Company other than the compensation to be paid to Global as provided herein.

5.2    Confidentiality. All information received by any party with respect to the business and affairs of the Company or any Special LLC shall be considered confidential and shall not be utilized by any other party for its advantage or disclosed to others to the detriment of such party; provided, however, that this sentence is not intended to and shall not prevent any disclosure of information relating to the Company or any Special LLC to the professional advisors or agents of any party nor to prevent any disclosure to the extent required by law, provided that they are subject to obligations with respect to the confidentiality and use of such information that are the same as contained in this Section 5.1. Confidential information shall be deemed to include all information disclosed by Xethanol pursuant to the provisions of Section 2.8.

5.3    Expenses. Each party hereto shall pay his, her or its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated herein.

5.4    Notices. All notices, requests, demands or other communi-cations required or authorized or contemplated to be given under this Agreement shall be in writing and shall be deemed to have been duly given if hand delivered or sent by certified or registered mail, postage prepaid, and addressed to a party at its address as first set froth above, or at such other address as any party may from time to time furnish to the other party by a notice given in accordance with the provisions of this Section. All notices shall be deemed given (i) two business days after deposit into the U.S. Mail, or (ii) when personally delivered in the manner provided in this Section.

5.5     <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

5.6     <u>Assignment</u>. This Agreement may not be assigned by any party without the prior written consent of all of the parties hereto; provided that Associates may assign this Agreement to any entity which is controlled by or is under common control with it, without consent. Any attempt to assign this Agreement without the required consent shall be void. This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective heirs, successors and assigns.

5.7     <u>Entire Agreement</u>. This Agreement, together with the Exhibits hereto, contains the entire understanding between the parties hereto concerning the subject matter hereof and may not be changed, modified, altered or amended except by an agree-ment in writing executed by the parties hereto.

5.8     <u>Amendments</u>. Any change, modification, alteration or amendment shall be effective only in the specific instance for the specific purpose for which given. Any waiver by either party of any of its rights under this Agreement or of any breach of this Agreement shall not constitute a waiver of any other rights or of any other future breach.

5.9     <u>Applicable Law</u>. This Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of New York for contracts to be performed wholly within the State of New York, without reference to conflict of law principles.

5.10     <u>Jurisdiction and Venue</u>. In the event that any legal proceedings are commenced in any court with respect to any matter arising under this Agreement, the parties agree that:

5.10.1     The courts of the State of New York and/or the United States Federal Courts located in the State of New York shall have exclusive jurisdiction over each of the parties hereto and over the subject matter of any such proceedings; and

5.10.2     the venue of any such action shall be in New York County, New York and/or the United States District Court for the Southern District of New York.

5.11     <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the terms and conditions contained in this Agreement.

-7-

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

Xethanol Corporation                          Global Energy and Management, LLC


By:/s/ Christopher D'Arnaud-Taylor            By: /s/ Lee R. Tyrol
Christopher D'Arnaud-Taylor                   Lee R. Tyrol
CEO                                           President and CEO

-8-

Schedule A

<u>Services to be Provided by Global</u>

1.     The selection, employment, promotion, discharge and supervision of the executive staff and through the executive staff, the hiring, promotion, discharge, and work of all other operating and service employees performing services on behalf of each Special LLC and relating to each applicable Special LLC. All employees shall be on the payroll of the applicable Special LLC. The decision in regard to any change or replacement of employees shall be at the sole discretion of Global.

2.     The establishment of all prices and rate schedules for the products produced by the applicable Special LLC, and the negotiation and entering into of all contracts for the sale of its products by the applicable Special LLC.

3.     The negotiation and arranging of contract for the acquisition of feedstock, utilities and other goods and services required for the operation of the applicable Facility, and the monitoring, supervision of the performance of third parties under and enforcement of such agreements.

4.     Applying for, obtaining, and maintaining in the name of the applicable Special LLC all licenses and permits required of in connection with the operation of the applicable Facility. The applicable Special LLC shall execute and deliver any and all applications and other documents necessary therefor and to cooperate to the fullest extent possible with Global in the performance of these obligations.

5.     The submission to the Company for its approval of an annual budget of operations thirty (30) days before the commencement of each fiscal year. Global may deviate from such budget if in its reasonable judgment a deviation is necessary or desirable for the efficient operation of the Facility, subject to the approval of the Company, unless in the judgment of Global, the expense in question must be incurred as an emergency expense.

6.     The implementation and maintenance of suitable accounting and internal control systems.

7.     Performing all acts reasonably necessary in connection with the operation of the applicable Facility in an efficient and proper manner.